**TAYLOR DITCH COMPANY, INC., Appellant (Defendant and Third-Party Plaintiff below),**

v.

**Harold CAREY and Vera B. Carey, Appellees (Plaintiffs below),**

**Harold D. Del MONTE et al., Appellees (Third-Party Defendants below),**

**Gilpatrick Construction Company, Inc., a Wyoming corporation, Appellee, (Third-Party Defendant below).**

**Nos. 4235, 4290.**

Supreme Court of Wyoming.

March 13, 1974.

W. A. Smith, George L. Simonton, and Meier & Gist, Lander, for appellant.

F. M. Andrews, Jr., Riverton, for appellees Harold and Vera B. Carey.

H. W. Del Monte, Lander, and White & Hansen, Riverton, for appellees Harold D. and Alice Del Monte, and B. and Emily Blonder.

Robert R. Rose, Jr., Casper, for appellee Gilpatrick Construction Company, Inc.

Before PARKER, C. J., and McEWAN, GUTHRIE, McINTYRE and McCLINTOCK, JJ.

Mr. Justice McCLINTOCK delivered the opinion of the Court.

In case No. 4235 Taylor Ditch Company, Inc., defendant below and hereinafter referred to as Taylor or the ditch company, appeals the judgment of the District Court of Fremont County, Wyoming, entered January 16, 1973, allowing money damages and injunctive relief to Harold and Vera Carey, hereinafter referred to as the plaintiffs or by name, for injuries to their dwelling house and other improvements found by that court to have resulted from seepage through the bank of an irrigation canal owned and operated by Taylor for the delivery of water to landowners holding water rights in the area under the canal.

In case No. 4290 the ditch company appeals from an order entered in the district court after the appeal in No. 4235 had been docketed in this Court, in which order the lower court refused to take jurisdiction of a motion to suspend the injunction but did stay enforcement of the injunction upon the condition that the ditch company post a supersedeas bond in the amount of $12,000.00.

Since the matters involve the same basic set of facts the cases have been consolidated for purposes of the opinion.

APPEAL IN CASE NO. 4235

Lot 17, Block 4, Chevy Chase Second Addition to the City of Lander (apparently a suburban type of development) was purchased by the Careys in 1954. The lot is situated on a hillside and the southerly boundary thereof is the Taylor ditch. The slope of the hillside is to the north and in 1956 the Careys effected a level location for a house site by cutting the hillside on the south portion of the lot and moving this soil to the north side. The resulting level area is some 20 feet lower than the bottom of the ditch and horizontally about 40 feet to the north. In addition to cutting into the hillside some eight feet to get this level lot, the plaintiffs excavated another seven to eight feet at the rear and three to four feet at the front of their house location for a basement.

For many years prior to 1954 the ditch had extended along the hillside in a fairly straight course from west of what is now Lot 17 to a point east thereof near the west side of U. S. Highway 287, at which point it made about a 90 degree turn to the south for a short distance before again turning east to pass under the highway. In the spring of 1962 Harold D. Del Monte, Alice Del Monte, B. Blonder, and Emily Blonder, third-party defendants and hereinafter referred to as the partners, owned land to the east and north of the Carey property, a portion of which was included in the same hillside upon which the Carey property was located. They desired to cut away a part of that hill and use the earth to fill in to the north and west, a part of this fill to be immediately adjacent to the east and north of the Carey lot. This project necessitated a relocation of the ditch by moving the 90 degree bend a short distance to the west so that it would then be almost directly south of and substantially closer to the Carey lot.

In April of 1962 an agreement was entered into between the partners and the ditch company whereby the partners were permitted to make this partial relocation of the ditch, requiring some 745 linear feet of

new ditch. The partners then entered into an agreement with Gilpatrick Construction Company, an additional third-party defendant and hereinafter referred to as Gilpatrick, to do both the earth moving and relocation of the ditch. These agreements contain separate but similar provisions whereby the partners agree with Taylor and Gilpatrick agrees with the partners to indemnify and save them harmless from any liability to third persons that might result from the relocation. Although no part of the Carey land was or would be traversed by the old or relocated ditch, a written memorandum of agreement was signed by Harold Carey under the terms of which he agreed to the relocation of the ditch as contemplated by the agreement of the same date between the partners and the ditch company.

The Careys had completed the basement of a house on their lot in 1956 and either they or their tenants occupied this portion of the house until 1961. In that year the Careys again moved into the house and thereafter completed the upper portion of the building although some rooms were not completely finished at the time of the trial. The relocation of the ditch was completed in May of 1962 and since that time has been in continuous use during the irrigation season. The land area around the house had been dry prior to 1962, but some time after the relocation of the ditch moisture began to appear, first in the area of the cut bank, and then in the basement. This moisture gradually spread so that as of the time of trial the structure and foundations of the house were affected. The only evidence of any seepage in the area prior to 1962 was at a point in the ditch some 150 feet to the west of the Carey property.

Difficulties with a septic tank, gas line, and sewer line also developed after 1962,

some occurring before March 1, 1967 and some after that date. The house has been unoccupied since January of 1972 and at the time of the trial was considered unlivable because the sewer, installed in 1968, was not working.

The complaint, filed March 1, 1971, named only Taylor as a party defendant. Taylor filed an answer denying liability and later and with leave of court filed a third-party complaint against the partners, claiming that any negligence in the relocation of the ditch, if any, was theirs and further claiming that any amount Taylor might have to pay the Careys should be reimbursed by the partners under the indemnity provisions of the agreement. The partners then filed a third-party complaint against Gilpatrick alleging that if there was any injury to the plaintiffs it was the result of negligent construction by Gilpatrick, and also claiming that any amount they might have to pay by reason of the injuries should be reimbursed by Gilpatrick under its contract of indemnity.

A pretrial conference was held, attended by all parties, and the order pertaining thereto recites that motions of the partners and Gilpatrick for dismissal of the third-party complaints on the grounds that the four-year statute of limitations [1] had run before the commencement of the action had been argued and granted and the third-party defendants dismissed from the action. As a further part of the pretrial order it was declared that the only issue remaining in the case was:

"* * * whether or not defendant Taylor Ditch Company, Inc., was negligent in its operation of the ditch commonly known as the Dutch Flat Ditch or the Taylor Ditch from March 1, 1967, until the present time, it having been previously determined by the Court that prior to March 1, 1967, the statute of

---

1. The order does not refer to the particular statute of limitations involved but from other references in the record it appears that it is § 1–18, W.S.1957, imposing a four-year limitation on actions for injuries to real or personal property. No reference is made in the order to the ten-year limitation on actions upon a contract or agreement in writing, § 1–16, W.S.1957, raised in Gilpatrick's answer as barring any claim of the partners predicated upon the indemnity provisions of the construction contract.

limitations had run and that no damages, if any existed, were available to the Plaintiffs."

This order further directs that it shall supersede and supplement the pleadings and govern the course of the trial unless modified to prevent manifest injustice and all pleadings were declared amended to conform to the order. No subsequent amendment was sought by either party.

Neither the pleadings nor the pretrial order set forth any specific acts of negligence charged against the ditch company in the operation and maintenance of the canal, and prior to the commencement of taking evidence the defendant moved the court for specific finding of facts of the acts constituting negligent maintenance, if any, in the operation of the ditch by the defendants, the source of the water, if any, causing the damage, if any, and the facts showing that defendant's negligence, if any, was the proximate cause of the damage complained of.

Immediately following the presentation of evidence and argument by counsel the trial judge orally announced his findings and decision and later a formal judgment was entered. This judgment, captioned only with the names of the plaintiffs and the ditch company, makes no reference to the third-party complaints, and no formal order of dismissal thereof was ever entered. The judgment contains general findings to the effect that plaintiffs' land was dry until the year 1962, in which year the curve in the ditch was changed; that thereafter their land became wet and unstable causing it to slide and migrate, as a result of which plaintiffs sustained damages some of which were barred by the four-year statute of limitations; and that the damages within the four-year period amounted to $1,518.20 for repairs and $7,500.00 for loss of value to the buildings and lands. Special findings are that the

ditch company "has a duty to maintain its ditch in such a manner so as not only to allow an even flow of waters, but to prevent seepage from the ditch onto the lands of another", and that "the seepage occurs as a result of the ditch company's negligence to maintain its ditch adequately so as to prevent such seepage". It is further found that the damage to the land is continuing and plaintiffs have no adequate remedy at law. The Careys were awarded damages in the amounts mentioned and the ditch company was enjoined from using the ditch for purposes of transporting water "until such time as the ditch is adequately repaired so as to prevent further seepage or loss of water onto the plaintiffs' property."

Two notices of appeal were served and filed, the first some 15 days after entry of the judgment, and the second just before the 30 day period for filing expired. The first of these notices is captioned only with the names of the plaintiffs and the ditch company and was served only on the attorney for the Careys. The second bears those names and additionally all the third-party defendants and was served on attorneys for those parties as well as the attorney for the Careys. Both notices state that Taylor Ditch Company, Inc. (described in the second notice as defendant and third-party plaintiff) appeals to the Supreme Court of Wyoming from the judgment dated January 15 and entered January 16, 1973 (the second notice refers only to the date of entry of the judgment).

■ Neither the ditch company nor the Careys question the pertinence and authority of the previous decision of this Court in Howell v. Big Horn Colonization Company (1905), 14 Wyo. 14, 81 P. 785, 790, 1 L.R.A., N.S., 596,[2] where it is said:

"The well-settled rule is that the owner of an irrigating ditch is bound to exercise reasonable care and skill to prevent

---

2. Cited with approval in Jacoby v. Town of Gillette (1946), 62 Wyo. 487, 174 P.2d 505, 177 P.2d 204. In Redland v. Tharp (Wyo. 1972), 498 P.2d 1240, this Court expressly refused to abandon the stated rule in favor of one of strict liability. The issue as stated in the pretrial order is consistent with *Howell.*

injury to other persons from such ditch, and he will be liable for all damages occurring to others as a result of his negligence or unskillfulness in constructing, maintaining, or operating the ditch."

The ditch company's main contention on this appeal is that the judgment is based on a finding and conclusion of law that water was seeping from its ditch on to plaintiffs' land and therefore the company ipso facto was negligent in the operation and maintenance of the ditch. Particular reference is made to the oral finding of the trial court that

"* * * [i]t's my understanding that the general rule is that one who maintains the ditch must not do so to the detriment of those who adjoin it or are along it, and, if you fail to do that, of course, there is negligence."

As counsel express it, "The Court finds that there is seepage from the Taylor Ditch and therefore the Ditch Company is guilty of negligence." Arguing that this is contrary to the established law in Wyoming and throughout the western area, and that the burden of proof is upon the Careys to establish by a preponderance of the evidence not only that the seepage came from the Taylor Ditch but that it was caused by some specific act or acts of negligence or by want of due care on the part of the ditch company, it is contended that there is no evidence to support the judgment of the trial court and that the cause should be reversed and remanded with directions to dismiss the action.

We have carefully examined the record in the case and believe that while it is arguable that remarks of the trial court such as the one last quoted indicate an incorrect interpretation of the general responsibility of a ditch owner, nevertheless when they are taken in their full context we are justified in concluding that the court's findings of the source of the water and the cause of the seepage are consistent with the rule as laid down in *Howell.* We are further convinced that there is substantial evidence to support the trial court's findings that water from the Taylor ditch seeped on to the Carey property as the result of negligent operations on the part of the ditch company, causing injury to the Careys.

First, as to the source of the water, the trial court found that there was a direct correlation between the presence of water in the ditch and the seepage on to the Carey property. The witnesses Oliver and Van Drew, both of whom were accepted as qualified experts in the field of water and irrigation, testified concerning detailed investigations which they had made on the ground and without objection expressed opinions that the water on the Carey property was coming from the ditch. Their opinions were supported by reference to factual data and were in all respects credible. Counsel for the ditch company would have us ignore this evidence and accept the opinion of Mr. Chen, another well-qualified expert, that the seepage was the result of a natural ground water table, but this would require us to ignore our oft-cited rule that in passing upon the sufficiency of the evidence to support the decision of the trial court this Court will

"* * * assume appellees' evidence is true without consideration of the conflicting evidence and give thereto every favorable inference which may be reasonably or properly drawn therefrom."[3]

Proceeding then to the question of whether there was evidence of negligence on the part of the ditch company, both the oral findings of the trial judge and the judgment indicate that he considered that it was the failure of the ditch company to take proper precautions in constructing and maintaining the ditch through pervious soil that constituted the negligence. This view is consistent with *Howell,* in which this Court sustained the lower court's holding that mere seepage without negligence would not justify recovery but reversed its

3. Zullig v. Zullig (Wyo.1972), 502 P.2d 198, 200; see also Arnold v. Jennings (1956), 75 Wyo. 463, 296 P.2d 989.

holding that there was no negligence. It was said, 81 P. at p. 791:

"If the company saw fit to construct its ditch through soil naturally incapable of holding water, it should at least have made *all proper and reasonable efforts to prevent seepage therefrom.* Failing to do so, it was clearly negligent." (Emphasis supplied.)

The trial court found, and from our examination of the record we think properly, that until 1962 there was no difficulty with the ditch in the vicinity of the Carey property; that after the relocation of the curve it was much closer to the Carey home; that some 75 feet of the ditch at this point were constructed in moderately pervious material indicating the need of extra care; that extra care was originally taken in the installation of a polyethylene lining at this point of the ditch but that the ditch was compacted only to the extent that would result from heavy equipment running over the area in the course of the earth-moving and relocation work; and that repairs were made from time to time and when such repairs were made the water level went down in certain test or observation holes drilled in the area. It was said that the company

"should have either lined the canal, dug it out and properly compacted it, put material in this particular area, wherever it may be, and certainly they could extend it to cover any area that might even be inspected. They could have done this. They didn't choose to do it. If they had even compacted the 75-foot of moderate perviousness as indicated by Mr. Chen, maybe that would have at least helped it. This is indicated especially where the old fill was made and the direction of re-alignment of the new ditch was changed."

The trial judge does not specifically refer to the testimony of Mr. Oliver in this respect but the record shows that Oliver after setting forth the observations upon which he based his conclusion that the seepage was coming from the ditch, also referred to the "condition of the canal lining around the curve immediately south of the Carey home, which condition, as I previously mentioned, is extremely poor, rendering its effectiveness virtually nil." The witness then presented a succinct summary of remedies that could have been instituted to prevent the seepage, including the installation of a concrete lining or pipe, which was thought by the witness to be quite expensive. However, other suggestions were made which would have been less expensive, including the digging of a trench along the left bank of the canal, putting in a plastic liner and backfilling, or excavating the existing canal and filling back with a compacted select material. The plastic repair, it was said, would last for a considerable length of time. While no specific cost figures were given, his testimony was that such work would be cheap and economically within the range of a private canal company. His testimony in this respect is unchallenged.

There is therefore no question from the evidence but that a liner was installed at the time the curve was relocated and that this has been permitted to deteriorate. This liner was installed by the partners as part of their relocation work but it is not questioned that the ditch company knew of its installation and the deterioration thereof. The ditch was inspected on at least an annual basis and quite a bit more frequently in the curve area, quite often referred to as the slide area. The duty to maintain is, we think, a continuing one and there is sufficient evidence in the record to justify the conclusion that the ditch company, although it did not itself construct the ditch, either permitted it to be relocated in or continued to operate it in soil which it knew or should reasonably have known to be naturally of questionable capability to hold water, and although efforts may have been taken in the first instance to prevent seepage therefrom, those efforts were not effective or were not continued, so that the ditch company has not made all reasonable effort to prevent seepage therefrom. Un-

der the ruling in *Howell*, failing to do so, it was negligent.

Counsel for the ditch company contend, however, that it had no knowledge of the seepage condition until after the commencement of the litigation when Oliver's testimony gave it its first actual notice that possibly there was a defect in its ditch. It is said that the testimony of Carey that he complained to Allen, president of the ditch company, about the trouble he and other adjoining owners were having with the ditch was no notice of a claim of seepage and that the time of such conversation was not given. Although the objection that this complaint was no notice of seepage appears to be a mere quibble, the fact that the time of the conversation was not given has afforded us some concern. Both Allen, as to a continuing period of some years, and Sherlock for the period 1971 and 1972, testified that they had no knowledge that there was seepage from the ditch. However, the Carey property is only some 40 or 50 feet from the ditch curve and it is difficult to see how any proper inspection of the area of the curve would have failed to disclose the presence of water upon the Carey property. Keeping in mind the fact that by 1962 the area traversed by the ditch had changed or was changing from open country to a business and residential area, we think that the duty to inspect and protect against seepage would be more exacting than when the surrounding lands were unimproved and that reasonable inspection would require investigation of the condition of lands in the immediate vicinity, particularly in the so-called slide area where difficulties in the ditch could result in serious harm. While the seepage at no time amounted to a stream of water running from the ditch we do think there were enough indications of water on the Carey property to cause a reasonable man to make further investigation. We hold, therefore, that the trial court's finding that the ditch company had been guilty of negligence was sustained by substantial evidence.

As we have indicated above, the trial court allowed a total of $1,518.20 as damages for repairs necessitated by the seepage of water on to the Carey property and $7,500.00 as general damages for reduction in value of the property. As to the first of these items, the ditch company complains of the allowance of damages for changes in and repairs to the sewage disposal system and gas line serving the Carey home, on the ground that it is mere conjecture that the seepage created the necessity for these changes and repairs. Counsel for the Careys responds only that the defendant has offered no evidence that the expenditures were not necessarily incurred as a result of seepage from the ditch.

This is not an adequate response. While we have held that the trial court's finding that water seeped from the ditch through negligence is supported by substantial evidence, the burden still remains with the plaintiffs to establish that that seepage resulted in injury to the plaintiffs and the amount of damages resulting therefrom. In this case the amount necessarily and reasonably expended for changes and repairs has not been attacked, but in our judgment plaintiffs have overlooked the intermediate step of proving that the seepage was the cause of those changes and repairs.

Considering first the costs of changing from the septic system to a sewer, the testimony of Mr. Carey is that his septic tank ran over and that he was required to abandon this system and hook up with a sewer at the instance of the health officers of the state, whose authority in the matter is not questioned. However, it is not shown by any evidence that we have been able to find in the record that it was seepage from the ditch that brought about this condition. The bad effects of the overflow of the system appeared at some distance away from the Carey property and from what was shown to be the septic field. There is no evidence that the system was adequate in its design or was properly installed, the only evidence being that when Carey install-

ed the tank the land was dry. The evidence in this instance is far short of what was shown by Oliver and Van Drew as to the fact of seepage and their definite opinion that seepage in the house area came from the ditch. Neither of these witnesses testified with respect to the septic system so any finding that the improper working of this system was due to seepage must be based on bare assumption. Septic systems are not always perfect and since nothing has been shown concerning this one we do not think that we can make that assumption.

The same observation must be made as to damages for repairs because of buckling and stoppage of the sewer line. We are not informed as to the skill with which it was installed, its depth, whether it was placed below frost line in original soil or filled earth, or whether the materials used were suitable for the existing conditions. We are told that plastic pipe was used. There is evidence that there was considerable shifting of soil in the area, apparently resulting from the cutting and filling done by the partners, but the ditch company would not be liable for any damage to the sewer line resulting from such shifting unless seepage from the ditch contributed to the slippage. There is no evidence that such was the case. Neither Carey nor his witness who assisted in repairing the pipe line at any time testified to the presence of water or moisture at the location of the break or stoppage. Here again the plaintiff's evidence has not excluded the reasonable possibility that the breakage—or in some cases stoppage—resulted from some other cause for which the ditch company was not responsible.

Counsel for the ditch company state that there is absolutely no evidence to justify

the judgment for expense in relaying the gas line. The evidence does show that this was required because the then existing line broke when the main line buckled or shifted, but whether or not that shift was the result of seepage or some other cause is not shown.

We therefore exclude from the damages the items relating to the substitution and repairs of the sewer, as well as the expense of relaying the gas line, which, as computed by counsel for the ditch company, are clearly shown by the record to have amounted to $1,192.78. The remainder of the allowance for repairs, $325.42, we think is for repairs to the house area itself, and these are sustained by the record.

■ We do not consider the objection taken by the ditch company to the allowance of $7,500.00 as general damages for reduction in value of the house to be well taken. It is clear that the trial court was attempting to fix the damages to the house on the basis of a comparison of appraisals before and after those injuries which occurred within the period of limitations. To that end he referred to the testimony of John Begovich to the effect he had examined the property in 1970 and appraised it as worth slightly over $25,000.00, were it not for the presence of the water, by reason of which fact he reduced the valuation by $8,700.00 or a net valuation as he expressed it of $16,500.00. The witness had examined it again at the time of the trial and fixed the then value at $8,000.00. Giving consideration to the varying testimony in this phase of the case the trial judge announced that he considered $7,500.00 a fair figure for the loss in value of the house.[4]

The ditch company contends that the seepage problem arose in 1963 "and it must

4. In sustaining this appraisement we are aware that Mr. Begovich testified that in arriving at the $8,000.00 valuation at the time of the trial he took into consideration that there was no workable sewer for the house. We have indicated that we are not satisfied from the evidence that the damage to the sewer was caused by seepage from the ditch and it might be thought that we are therefore

accepting a valuation that has been reduced by something for which the defendant was not responsible. The record shows that the original sewer was constructed at a cost of some $350.00, and Mr. Jones, testifying for the defendant as to the probable costs of various repairs that should be made to the house to put it in marketable condition, said that $1,000.00 should handle that item.

be assumed that the reduced value took place as of that time, in which event the statute of limitations would run as to this entire damage". We do not know why this is so. If the seepage began to do damage in 1963 it would appear much more reasonable to conclude that the house was not immediately ruined but that as the seepage continued the damage to the house increased. Thus, it is entirely probable that the valuation was reduced between 1963 and March 1, 1967, but it is clear that Mr. Begovich's appraisal in 1970, well within the period of limitations, made allowance for $8,700.00 depreciation because of the water damage. If there was error, then, the error was in not fixing the amount of the $8,700.00 reduction that occurred between March 1, 1967 and his examination in 1970, but that would have resulted in larger damage to the plaintiffs so defendant cannot complain of that failure. We therefore hold that the trial court's allowance of damages for the reduction in the value of the property must be sustained.

■ The ditch company argues that the injunction should not have been issued in any event because the plaintiffs had an adequate remedy at law. The trial court found to the contrary; no authorities are cited as to why this was erroneous. We think the court's action was proper. In 42 Am.Jur.2d Injunctions § 40, p. 779, it is said:

"It is not enough that there is a remedy at law. The remedy, in order to preclude injunction, must be certain and reasonably prompt. * * * The chief cause of the inadequacy of the remedies at law lies in the fact that the injury is irreparable or will occasion a multiplicity of suits."

In 11 Wright and Miller, Federal Practice and Procedure: Civil § 2944, p. 397, it is said:

"The legal remedy is inadequate if any one of a number of factors is present. Accordingly, * * * if plaintiff demonstrates that effective legal relief can be secured only by a multiplicity of actions, as, for example, when the injury is of a continuing nature, so that plaintiff would be required to pursue damages each time he was injured, equitable relief will be appropriate."

Were we to accept the ditch company's argument in this regard, it would mean that it could proceed year after year to permit the ditch to seep, gradually destroying plaintiffs' property, rendering it completely unsalable and leaving plaintiffs to an annual or quadrennial action to recover damages. While the judgment is somewhat deficient in stating the reasons for issuance of the injunction, we think there was sufficient ground therefor.

■ This leaves for consideration only the ditch company's contention that the third-party defendants should not have been dismissed from the action. It is argued that the court should have determined upon the trial whether or not the seepage in question resulted from the realignment of the ditch and if so entered judgment accordingly under said parties' written indemnity agreements.

Again, counsel cite no authority, but merely because a four-year limitation is applicable as against plaintiffs' right of recovery for injuries to real and personal property application of that same limitation to an action to recover on the written indemnity is not required. Under such circumstances it would appear that § 1–16, W.S.1957, providing a ten-year limitation on an action upon a written agreement, would apply causing the trial court to be in error in applying the four-year statute to the third-party claims. However, as pointed out by counsel for the partners, the written indemnity of the ditch company by the partners is " * * * from any liability or liens which might be the result of the relocation". We have held only that the defendant was liable for its negligence in operating the ditch. We therefore agree that the indemnity provisions are not applicable to the third-party claim of the defendant against the partners and sustain the dismissal of the partners.

Since the dismissal of the partners from the case was proper we think it also follows that Gilpatrick cannot be liable to the partners on its indemnity to them and there is no basis to conclude that there was any direct liability from Gilpatrick to the ditch company. Again, if that company were directly liable on its indemnity it would be only for matters growing out of the construction and not for negligent operation by the ditch company.

We therefore hold that the judgment should be modified by eliminating therefrom the allowance of damages to the plaintiffs in the amount of $1,192.78, and as so modified the judgment is affirmed.

### APPEAL IN CASE NO. 4290

■ The record on appeal in the foregoing case was filed with this Court and the case docketed herein on April 26, 1973. The record shows that shortly thereafter the ditch company made repairs on a portion of the ditch and in May of that year it again began to transport water therein without prior approval of the district court by supplemental order or otherwise.

On July 9, 1973 the Careys, claiming that the repairs were ineffective and the ditch still leaking, filed another petition in the action, alleging the issuance of the injunction and the attempted but ineffective repairs so that when water was again put into the ditch it seeped therefrom on to the Carey property and was causing it to subside. The petition prayed that the ditch company be required to show cause why it should not be held in contempt for failure to obey the injunction. An order to show cause was issued and the matter was set for hearing on July 25. The manner of service of the order is not shown.

Prior to hearing and on July 11, 1973 the ditch company filed its motion to suspend the injunction on the grounds that it had complied with the order by repairing the ditch prior to turning the water into the ditch. Both parties appeared on July 25 prepared to present evidence concerning the repairs. However, after an extended colloquy between counsel and the court and without presentation of any evidence the court orally announced its ruling, incorporated into written order dated August 6, in which it found that notice of appeal had been filed; that no supersedeas bond had been filed; that the order for the injunction had not been stayed; that defendant's motion to suspend injunction is beyond the jurisdiction of that court; and that the defendant might have a stay of injunction pending appeal upon posting a supersedeas bond in the amount of $12,000.00, which amount "is sufficient to cover Plaintiffs' Judgment, together with interest, costs and further damages, if any, which may accrue". The order directed defendant to deposit the bond, conditioned for the satisfaction of the judgment [5] and upon deposit of the same the injunction previously entered "shall be stayed, pending the decision of the Supreme Court, and final disposition of this cause". The order did not stay or in any way refer to execution upon the money judgment.

The ditch company contends that the lower court erred both in finding that the lower court's motion to suspend the injunction was beyond the jurisdiction of the court and in requiring it to post a supersedeas bond in the amount of $12,000.00. We think this is correct and that the lower court erred in both respects.

Rule 62(c), W.R.C.P., as we read it reserves jurisdiction to the district court, whatever the status of the appeal, to consider virtually all matters relative to an injunction which may have been issued or

5. The condition of the bond as set forth in the order is "for the satisfaction of Plaintiffs' Judgment in full, together with costs and interest, and damages for delay, if for any reason the Appeal is not perfected or

dismissed, or if the Judgment is affirmed, and to satisfy in full such modification of the Judgment and costs, interest and damages as the Supreme Court of the State of Wyoming may adjudge and award".

denied by the district court.[6] We have not previously considered the application of this rule but it appears to us to be explicit in its provisions and the federal authorities construing the same section of the federal rules of civil procedure sustain this construction.[7]

Plaintiffs first sought to have the ditch company punished for contempt and that party sought to have the injunction suspended because it had been complied with. We think the trial court had jurisdiction to hear those questions and believe that it would have been within its discretion to delay action on the motion to suspend the injunction but to stay the enforcement thereof pending the appeal. Such action would properly require a bond but the proper condition of such a bond would have been to guarantee such damages as might result to the plaintiffs by reason of the stay, that is, future damages through seepage from the defendant's negligent acts. But what the trial court did was to stay the injunction only, without requiring bond for such damages as might grow out of that stay but upon guaranteeing payment of the money judgment itself, together with costs, interest and damages, as it might be affirmed or modified by this Court, and this without staying execution upon that judgment. While the trial court denied jurisdiction under Rule 62(c), it either exercised a limited power given by that rule or proceeded entirely under Rule 73, W.R.C.P. Under this latter rule one taking an appeal may secure from the district court a general stay during appeal by presenting a supersedeas bond at or before the time of taking the appeal. The required bond is conditioned as was the order and bond in this case. No such stay was sought by the appellant and nothing had been filed at the time the case was docketed in this Court so that only paragraph (e) of that rule applies. This provides in pertinent part that: "After the action is so docketed, application for leave to file a bond may be made only in the supreme court." The fact is then that the trial court has entered an order for stay of injunction that it had authority to issue only under Rule 62(c) but has conditioned the bond on the basis of a rule under which it had no jurisdiction.

The stay granted by the court is only as to enforcement of the injunction but the condition of the bond required is not to pay such damages as may have resulted from an improper stay. A proper bond would have been conditioned to pay those damages.

However, during the period of the appeal the ditch company has had the benefit of the stay and should not be excused from the bond requirement properly necessary to secure such stay. We think that proper relief can be given by remanding the action with directions to revoke the former supersedeas bond filed herein and permit the filing of an amended bond, effective as of the date of the earlier bond, but conditioned in such amount as the trial court may find is proper to assure to the plaintiffs payment of all damages that have been or will be suffered during the period

---

6. Rule 62(c), W.R.C.P. reads: *"Injunction Pending Appeal.* When an appeal is taken from a judgment or final order granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party."

7. United States v. El-O-Pathic Pharmacy (9 Cir. 1951), 192 F.2d 62, 79, holding that the rule created an exception to the generally applied rule that jurisdiction of the district court ended with the appeal, the purpose of the exception being a "recognition of the long established right of the trial court, after an appeal, to make orders appropriate to preserve the *status quo* while the case is pending in the appellate court." See also Vac-Air, Inc. v. John Mohr & Sons, Inc. (D.C.E.D.Wis.1972), 54 F.R.D. 580, 581: "The purpose of this rule was to give the trial court the power to preserve the status quo while the case is pending in the appellate court. * * * Inherent with this power to issue an injunction is the power of the court to punish for the disobedience of the order."

of the stay. It would appear that the amount of such bond would be considerably less than the bond to satisfy the judgment.

After the bond has been amended the court should then proceed to hear the question of whether reasonable repairs have been effected or can be effected so as to render unnecessary any further continuance of the injunction, and further to hear the parties with respect to the damages, if any, sustained by plaintiffs during the stay of the injunction.

We think this procedure is consistent with the purpose and intent of Rule 62 and particularly paragraph (e) thereof where it is specifically recognized that the power of this Court to stay proceedings or to make any appropriate order to preserve the status quo or the effectiveness of the judgment subsequently to be entered is not limited by Rule 62. It is said in 4 Am.Jur.2d Appeal & Error § 339, p. 821, that statutes often permit an amended bond to be filed but that "even in the absence of such a statute, the appellate court may have inherent powers to permit an amendment or substitution of a bond which has been filed in good faith". One of the cases there cited, Bock v. Sauk Center Grocery Co. (1907), 100 Minn. 71, 110 N.W. 257, cites a number of cases where the appellant filing the bond has been guilty of some overreaching and the appellate court permits an amendment. We think the principle is the same and that in this case the ditch company has been required to file a bond that was improperly conditioned and in an excessive amount.

The Careys contend that an order fixing a bond is not an appealable order because it is not final and is a matter ordinarily within the discretion of the trial court. The ditch company has appealed not only from the order fixing the bond but from the order insofar as it denied jurisdiction to consider suspension of the injunction. The order therefore appears to be one affecting a substantial right upon a summary application in the action, after judgment. Rule 72(a), W.R.C.P.

The cause is remanded to the district court with directions to take further proceedings relative to the injunction and stay thereof consistent with this opinion. This remand shall not be taken in any way as modifying our final disposition in case No. 4235.