2006 WY 37

**R. Michael REED and Icia Reed, Appellants (Plaintiffs),**

**v.**

**Leslie E. CLONINGER, Jr., Co–Trustee and Stanley Sheppard, Co–Trustee of the Carl M. Burgener Family Living Trust Fund; Cox and Fisher, Inc., a Wyoming corporation; Kenneth Jones; Melvin C. Parker; Janet L. Parker; and Shoshone Irrigation District, Appellees (Defendants).**

No. 05–74.

Supreme Court of Wyoming.

March 24, 2006.

Timothy M. Stubson of Brown, Drew & Massey, LLP, Casper, Wyoming, for Appellants.

S. Joseph Darrah of Darrah, Darrah & Brown, P.C., Powell, Wyoming, for Appellees Cloninger and Sheppard, Co-trustees of the Carl M. Burgener Family Living Trust Fund

S.B. Freeman III of Bormuth & Freeman, LC, Cody, Wyoming, for Appellee Cox and Fisher, Inc.

Patrick J. Murphy and Jakob Z. Norman of Williams, Porter, Day & Neville, P.C., Casper, Wyoming, for Appellee Jones

David B. Hooper of Hooper Law Offices, P.C., Riverton, Wyoming, for Appellees Melvin C. and Janet L. Parker

Michelle A. Pinkowski and Robert G. Busch of Godfrey and Lapuyade, P.C., En-glewood, Colorado, and Harriet M. Hageman of Hageman & Brighton of Cheyenne, Wyoming, for Appellee Shoshone Irrigation District. Arguments presented by Ms. Pinkowski and Messrs. Hooper and Freeman.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

HILL, Chief Justice.

[¶ 1] Appellants, R. Michael Reed and Icia Reed, husband and wife, (the Reeds), filed a complaint on March 31, 2004, alleging claims of negligence, nuisance, trespass, and a prayer for injunctive relief. The basis for those claims was that Appellees had caused irrigation water to damage their home. When speaking of the Appellees collectively, we will call them Appellees, and each individual Appellee may also be referred to by a given name or other identifying term. The district court granted summary judgment in favor of Appellees on the basis that the claims of the Reeds were barred by the application of the four-year statute of limitations. We conclude there are genuine issues of material fact which must be resolved before the statute of limitations can be applied and, therefore, reverse and remand for further proceedings consistent with this opinion.

## ISSUES

[¶ 2] The Reeds raise these issues:

1. Whether the district court erred in ruling that the [Reeds'] claims were time barred and finding that the [Reeds] had discovered their cause of action when they knew of water damage to their home, but did not have any knowledge of continuing seepage into their basement.

2. Whether the district court erred by failing to recognize the continuing duty of the Appellees and by refusing to hold that each new incident of water seeping onto the [Reeds'] property constituted a new cause of action for statute of limitations purposes.

Each of the Appellees states the issues in a form very similar to this:

A. Whether the district court erred in ruling that the [Reeds'] claims were barred

by the statute of limitations based on the fact that they knew or should have known of the existence of ground water damage in their basement when they purchased the home in December 1999.

B. Whether the district court erred in refusing to find each new incident of water allegedly seeping onto the [Reeds'] property constituted a new cause of action for statute of limitation purposes.

## FACTS AND PROCEEDINGS

[¶ 3]  At the outset, we will briefly introduce the Appellees and the role each plays in the facts and circumstances giving rise to this case.

[¶ 4]  Appellees, Leslie E. Cloninger, Co-trustee, and Stanley M. Sheppard, Co-trustee, of the Carl M. Burgener Family Living Trust Fund (Burgener Trust) owned farmland neighboring the Reeds until 2003, at which time that land was sold to the Appellees Melvin C. and Janet L. Parker (the Parkers).  Kenneth Jones (Jones) also owns farmland in the area that adjoins the Reeds' home.  The Burgener Trust considers itself a nominal party at this stage of the proceedings.

[¶ 5]  The house now owned by the Reeds was built in 1939 by F.J. Burgener, and he lived there until his death in 1968.  During that entire time, the basement of the house had water in it, and he was unable to abate the problem.  Donald F. Burgener lived in the house from 1968 until 1998.  When water seeped into the basement, he would pump it out.  According to Donald F. Burgener, this water seepage was caused by a rise in the water table under the farmland in the area, and that rise was caused by groundwater due to irrigation of the farmland.  So long as the house sits in the middle of the farming community wherein it was constructed and the local farmers continue to farm around it, the water table will be high at certain times, and the basement of the house will take on water. Appellees Cox and Fisher, Inc. (Cox and Fisher) have farmed the property west, north, and east of the Reeds for a number of years.  Cox and Fisher lease that farmland from the Parkers and Jones.

[¶ 6]  The Shoshone Irrigation District (District) provided a comprehensive statement of the facts that we will recite in its detail:

1.  In 1925, the District was incorporated pursuant to Wyoming law as an irrigation district, upon petition by owners of the lands that were to be included within the new irrigation district.

2.  In 1926, the District contracted with the U.S. Department of the Interior, Bureau of Reclamation, to become a reclamation district under the 1902 Reclamation Act and subsequent Reclamation laws.  Through that contract, the District agreed to deliver reclamation water to farmers within its boundaries.  At the time of making the contract, it was specifically contemplated that "seepage and other unavoidable incidental losses" would occur and be taken into account in performing the terms of the contract.

3.  The District delivers water to its user via gravity from the Garland canal, its main canal, to laterals (which are underground pipes), then from the laterals to sub-laterals (which are also underground pipes), then from the sub-laterals to headgates (measuring devices/valves that the District can turn on or off to deliver water, depending on water requests).

4.  The property at issue in this case lies in the southwest portion of the Shoshone Irrigation District, on the southwest corner of a farm.  This area is covered by lateral "R," then sub-laterals "OR" and "2R."  Sub-lateral OR is north of [the Reeds'] property and does not border it.  Sub-lateral 2R runs along the southern boundary of [the Reeds'] property.  At the southwest corner of [the Reeds'] property is headgate "2R–1."

5.  The District turns 2R–1 on and off at various times during the irrigation season to meet the water demands of its customers.  When the headgate is turned on, water flows from sub-lateral 2R through 2R–1 and into the 2R–1 ditch running along the west side of [the Reeds'] property, for delivery to water users to the north of [the Reeds'] property.

6. Just to the west of the 2R–1 head ditch is the OR–1 waste ditch, into which water drains from the fields west of [the Reeds'] property. This waste ditch deposits the water back into the District's system by means of pipes which run under, but are not a part of, the 2R–1 headgate.

7. In 1939, F.J. Burgener built the house located at 1173 Lane 11, Powell, Wyoming 82435, which is the house [the Reeds] purchased in November of 1999.

8. According to Donald F. Burgener, the son of F.J. Burgener, water seeped into the basement of the house each and every irrigation season the entire time the Burgener family lived in this house, from 1939 until 1988.

9. The Burgeners dealt with this issue by placing items in the basement—freezers, a refrigerator, a stove, and a meat cutting table—on six-inch blocks and by using a sump pump to pump water back out into the OR–1 waste ditch.

10. When the Burgeners sold the house to Kyle and Mary Johnson in 1991, the house was inspected for a Federal Housing Administration (hereinafter "FHA") loan. It was noted at that time that the basement was and would continue to be wet during certain times of the year. After 52 years of the basement getting wet, the only repair that the FHA deemed required was shoring up some support beams.

11. The Johnsons lived in the house until 1999, when [the Reeds] bought the property and moved in.

12. Prior to selling the property to Mr. Reed, the Johnsons disclosed to him, in a "Seller's Property Disclosure" (hereinafter "Seller's Disclosure"), that there were moisture and/or water problems in the basement and crawl space. Their handwritten note regarding this issue stated that the basement and crawl space could get wet if the yard was flood irrigated.

13. Prior to purchasing the property, [the Reeds] commissioned Heart Mountain Home Inspections in Powell, Wyoming, to inspect the property and produce a "Building Inspection Report" (hereinafter the "Report"). The inspection was conducted on November 4, 1999.

14. [The Reeds] and the real estate broker for the Johnsons, William Metzler, were present during the inspection. Mr. Metzler has described the conversation he held with [the Reeds] on that day regarding the fact that the basement of the house gets wet during the irrigation season. Mr. Metzler told [the Reeds] that before the Johnsons bought the house, the Burgeners had to repair the beams in the basement due to water damage. Mr. Reed informed Mr. Metzler that he was an engineer and he understood the water damage issue.

15. The Report resulting from the November 4, 1999 inspection stated in numerous places that there was evidence of damage caused by long-term seasonal flooding in the basement. On page three it stated:

Minor horizontal cracking was observed in the foundation at the north wall. Cracks of this nature are usually the result of soil pressures on the exterior of the foundation wall, or "adfreezing" (frozen soil attaching itself to the foundation and causing uplift). **In either case, attempts should be made to reduce moisture content in the soil adjacent to the foundation.** [Emphasis added.]

16. The Report further provided:

**The floor structure shows evidence of substantial rot at the base of the stairs in the south end of the basement. This form of decay weakens the wood structure and causes distress to the building.** Rot develops where untreated wood is in contact with moisture at temperatures above 40 degrees F. For example, rot often develops where wood/soil contact exists. Damaged wood should be repaired or replaced and the conditions that have promoted the rot should be remedied. **The basement shows evidence of moisture penetration in the form of: efflorescence, water staining, interior finish damage, prior attempts to repair, prior major leakage reported to have been from flood irrigation of the lawn.** *It should be understood that it is impossible to predict the severity or frequency of moisture penetration on a one time visit to a home.* Virtually all basements

exhibit signs of moisture penetration and virtually all basements will indeed leak at some point in time. **The visible evidence is considered above average for a home of this age, construction and location. Further monitoring of the foundations will be required to determine what improvements, if any, will be required.** Basement leakage rarely affects the structural integrity of a home. [Emphasis in bold added.]

17. The report suggested that lot and roof drainage improvements be made to prevent further damage:

a. **"Lot drainage does not appear to be adequate at the west side of the home. Soggy areas, standing water or foundation dampness may result.** A qualified drainage contractor should be consulted regarding the remedies available for correction." [Emphasis added.]

b. "A moisture barrier [should] be provided between the finished walls and the foundation walls [of the basement]."

c. The sump pump's installation "should be improved to ensure proper performance."

18. After receiving the report and the Seller's Disclosure, Mr. Reed bought the property on November 23, 1999. By a later deed, both Reeds became owners of the property.

19. On March 31, 2004, four years and four months after purchasing the home, the Reeds filed suit against the District and the owners and lessees of the farm ground surrounding their property, seeking to enjoin all irrigation in the area and to recover from the [Appellees] for the damages allegedly caused to their property by irrigation of surrounding farmlands.

[¶ 7] The Reeds filed their complaint on March 31, 2004. The Reeds contended that they first noticed water in the basement of their home in June or July of 2000, and that had recurred in 2001, 2002, and 2003. The Reeds also averred that no irrigation was taking place at the time they purchased their home and there was no evidence of moisture in the home at that time. They claimed that they contacted the District and asked them to modify their irrigation practices and to

pay them damages. Eventually, the Reeds withdrew their claim for damages vis-à-vis the District, and asked only that irrigation in that area be enjoined until the District modified/repaired the defects in the system that caused the Reeds' problems. The Reeds stated claims on the theories of negligence, nuisance, and trespass, as well as for an injunction.

[¶ 8] The Reeds contended that all they knew in November of 1999, was that the basement might get wet if the yard was flood irrigated, and that Metzler did not tell them that the basement routinely took water during the irrigation season. As this case neared the hearing date, Mr. Reed filed an additional affidavit that contained this information:

8. That on April 18, 2003, using a hollow-stem auger, an engineering firm based in Sheridan, Wyoming, WWC Engineering, installed four groundwater monitoring wells (PZ–1 through PZ–4) on affiant's property. The locations of the wells are shown on Exhibit 19 attached hereto.

9. That affiant personally measured the four groundwater monitoring wells for the growing seasons of 2003 and 2004. That attached hereto as Exhibit 12 is a graph and as Exhibit 25 the daily monitoring well measurements shown of the graph respectively for the year 2003. That attached hereto as Exhibit 26 and Exhibit 27 are the graph and daily monitoring well measurements for [the] year 2004.

10. That by education, knowledge and experience, affiant is qualified to measure the four monitoring wells and prepare the graph and well measuring charts.

11. That based upon the data obtained, there is a direct correlation between when the water collects in the ditches, stands in the fields and area adjacent to the north and west of the Reed property and the annual intrusion of water into the Reeds' basement.

12. That defendants, as their interests may appear, during the irrigation seasons through systematic and intentional design and by means of drains, ditches, and pipes have funneled and continue to funnel the

water into the 2R–1 complex. The primary focus of this surface water is the 2R–1 complex southwest on the Reed Property. That during the course of irrigating the volume of water exceeds the capacity of the buried pipeline of the 2R lateral. The result is water discharged continuously into the Reed Property.

13. In addition to discharging the excess and run off water into the 2R–1 complex beyond its capacity, the irrigation water discharged into the unlined feed ditch seeps naturally under and across the Reed Property. See graphs attached as Exhibit 28.

14. That the injury to plaintiffs is of an annual nature so that plaintiffs will be required to pursue damages each time they are injured by defendants' conduct in the future.

15. That if defendants are allowed to continue with their same conduct, it would mean that defendants could proceed year after year to permit the ditch, waste drain, and other improvements to seep, and the irrigation practices to discharge water gradually destroying plaintiffs' property and rendering it unsaleable. Plaintiffs would be left with annual actions to recover damages.

[¶ 9] Later in the proceedings, the Reeds withdrew their motion for a temporary injunction on the basis that they could not post the required bond. All Appellees filed motions for summary judgment and supporting memoranda. A hearing was held on the summary judgment motions on December 2, 2004. On January 28, 2005, the district court issued its order granting the Appellees' motions for summary judgment. That order provided as follows:

The Court having reviewed the various motions and supporting affidavits, the pleadings filed in opposition, the pleadings and the whole of the summary judgment record, and having heard the arguments of counsel, and being thus advised, FINDS as follows:

1) The Court has jurisdiction of the parties and the subject matter of this dispute. Venue is proper in Park County, Wyoming.

2) The [Appellees], in varying forms put forth the same arguments; that [the Reeds] claims are time barred.

3) The applicable statute of limitations is four years pursuant to the provisions of W.S. § 1–3–105(a)(iv)(A) & (C).[1]

4) The [Reeds] knew or should have known of the existence of ground water damage in the basement of their home where [sic] they purchased it in December of 1999.

5) The [Reeds'] complaint was filed March 31, 2004, more than four years later.

6) The Court believes that the [Supreme] Court's ruling[s] in *Rawlinson v. Cheyenne Board of Public Utilities*, 2001 WY 6, 17 P.3d 13 (Wyo.2001), and *Waid v. State Department of Transportation*, 996 P.2d 18 (Wyo.2000) are controlling.

7) There are no genuine issue of material fact and these [Appellees] are entitled to judgment as a matter of law.

## STANDARD OF REVIEW

[¶ 10] When we review a summary judgment, we have before us the same materials as did the district court, and we follow the same standards which applied to the proceedings below. The propriety of granting a motion for summary judgment depends upon the correctness of the dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. A genuine issue of material fact exists when a disputed fact, if proven, would have

---

1. (a) Civil actions other than for the recovery of real property can only be brought within the following periods after the cause of action accrues:

   . . . .

   (iv) Within four (4) years, an action for:
   (A) Trespass upon real property;

(B) The recovery of personal property or for taking, detaining or injuring personal property;
(C) An injury to the rights of the plaintiff, not arising on contract and not herein enumerated; and
(D) For relief on the ground of fraud.

the effect of establishing or refuting an essential element of an asserted cause of action or defense. We, of course, examine the record from a vantage point most favorable to the party who opposed the motion, affording to that party the benefit of all favorable inferences that fairly may be drawn from the record. Questions of law are reviewed de novo. *Martin v. Committee for Honesty and Justice at Star Valley Ranch*, 2004 WY 128, ¶ 8, 101 P.3d 123, 127 (Wyo.2004).

## DISCUSSION

[¶ 11] We conclude the district court erred in granting summary judgment because there are many genuine issues of material fact which must be determined before this case can finally be resolved. The parties focus their arguments on various legal issues, including the continuing tort concept and application of the discovery rule. These legal principles certainly may be important to the ultimate resolution of this case and, consequently, we will address those issues in this opinion. However, before the legal concepts can be applied to finally decide this case, there are numerous factual matters which must be developed.

■ [¶ 12] First, the Reeds must identify the source of the water which seeps into their basement. Resolving which water source is causing the damage is necessary before it can be determined whether the statute of limitations has run, as well as, whether the release of that water violated any duty to the Reeds. Those determinations, of course, involve factual questions. See, e.g., *Howell v. Big Horn Basin Colonization Company*, 14 Wyo. 14, 81 P. 785, 787 (1905); *Taylor Ditch Company, Inc. v. Carey*, 520 P.2d 218, 222–23 (Wyo.1974). There are different possibilities of the source of the encroaching waters suggested in the record, including: leakage or seepage of water being delivered for irrigation from the irrigation works; waste water being collected and/or diverted by the irrigation mechanisms after irrigation; and a rise in the water table caused simply by the practice of irrigation.

■ [¶ 13] In general, the traditional principles of negligence define the duties of an irrigator. See Wyo. Stat. Ann. § 41–5–101 (LexisNexis 2005); and *Howell*, 81 P. 785. Failure to exercise reasonable care in directing irrigation or waste water is negligence, and the ditch owner will be responsible for the damages neighbors suffer as a result of his negligence. *Id.;* see also, Wyo. Stat. Ann. § 11–44–103 (LexisNexis 2005) (codifying Wyoming's Right to Farm and Ranch Act which is consistent with the notion that an irrigator must be found to be at fault before a neighbor may enjoin the irrigation activities under the law of nuisance); and Joseph R. Long, *A Treatise on the Law of Irrigation*, § 161, at 284–85 (2nd ed.1916).

■ [¶ 14] If the evidence indicates water invades the Reeds' home as a result of leakage or seepage from the Appellees' irrigation system or their attempts to recapture and/or divert the waste water, then the Reeds will be required to prove the Appellees were negligent in order to recover. Long, *A Treatise on the Law of Irrigation, supra.* Should the evidence reveal that the original design of the irrigation works is at fault, there will be a question of fact as to when the cause of action was discovered. Wyoming is a discovery state in which the statute of limitations is triggered when a plaintiff knows or has reason to know of the existence of a cause of action. *Cabot Oil & Gas Corporation v. Followill*, 2004 WY 80, ¶ 14, 93 P.3d 238, 243 (Wyo.2004).

[¶ 15] We have said:

In the usual case, the four year period begins to run from the date of the injury because that is when the cause of action accrues.

We have said quite recently:

Wyoming is a discovery state in which the statute of limitations is triggered when the plaintiff knows or has reason to know of the existence of a cause of action. *Mills v. Garlow*, 768 P.2d 554 (Wyo.1989). That rule with respect to statutes of limitations for tort theories was articulated in *Duke v. Housen*, 589 P.2d 334, *reh'g denied*, 590 P.2d 1340 (Wyo.1979), cert. denied, 444 U.S. 863, 100 S.Ct. 132, 62 L.Ed.2d 86 (1979), and it has been consistently followed. *E.g., Anderson v. Bauer*, 681 P.2d 1316 (Wyo.

1984); *Ogle v. Caterpillar Tractor Co.,* 716 P.2d 334 (Wyo.1986).

*Barlage v. Key Bank of Wyoming,* 892 P.2d 124, 126 (Wyo.1995). The acceptance of the discovery rule in Wyoming is attributed to *Duke v. Housen,* 589 P.2d 334 (Wyo.1979), although, in that case, the actual statute of limitations was borrowed from another jurisdiction.

Under the discovery rule as adopted in Wyoming, the statute of limitations will typically run from the date of the incident. The discovery rule can have the effect, however, of delaying the accrual of the cause of action in cases in which the injury or damage is not immediately apparent. We have said specifically that, "a tort is not complete and actionable until all the elements, duty, breach, proximate cause, and damage, are present." *Davis v. City of Casper,* 710 P.2d 827, 829 (Wyo.1985). This serves to balance the equities in latent injury cases when the injured party would be barred from bringing an action only because that person was unaware of the injury.

*Nowotny v. L & B Contract Industries, Inc.,* 933 P.2d 452, 456–57 (Wyo.1997).

[¶ 16] We ruled the plaintiffs' claims in *Waid v. State of Wyoming, Department of Transportation,* 996 P.2d 18 (Wyo.2000) and *Rawlinson v. Cheyenne Board of Public Utilities,* 2001 WY 6, 17 P.3d 13 (Wyo.2001) were barred by application of the discovery rule. In *Waid,* the Department of Transportation reconstructed a highway in the early 1980s, by raising the elevation of the highway as compared to the surrounding property. In order to address water drainage issues, the department installed culverts. The plaintiffs' property flooded during heavy rainstorms in 1987 and in 1993 because the culverts were of insufficient capacity to carry the excess rain water. Relying on the plain language of the statute of limitations contained within the Wyoming Governmental Claims Act, this Court ruled that the plaintiffs' claims accrued as of the date of the first flood in 1987. We stated, "[T]he time for filing a claim is measured not from the date damage occurs, but from the date on which the 'act, error, or omission' occurs ..."

*Waid,* 996 P.2d at 25 (citing Wyoming Governmental Claims Act, Wyo. Stat. Ann. § 1–39–113).

[¶ 17] The same rationale was applied in *Rawlinson.* Rawlinson's property was damaged by a leaking fire hydrant. A direct application of the discovery rule to the facts of *Rawlinson* resulted in the following ruling:

> A cause of action accrues when a claimant is chargeable with knowledge of an "act, error or omission." The occurrence of damage satisfies the requirement that an injured party knew or reasonably should have known of the potential of a wrongful act being the cause; however, it is not necessary for a claimant to know that someone may be legally responsible for his injury. The statute of limitations in this case began to run when, by her own admission, Ms. Rawlinson discovered property damage in June of 1995. We conclude that, with notice of the water seepage and its subsequent damage, Ms. Rawlinson reasonably should have known of a potential wrongful act being the cause. She then had to ascertain whether anyone was legally culpable. The undisputed facts demonstrate that Ms. Rawlinson had some reason to complain to the BOPU with regard to the seepage. In 1997, the BOPU received a report, presumably from Ms. Rawlinson, that her home had water seepage problems on and off for at least two years. As a result, the BOPU performed tests to check for leaks. Ms. Rawlinson's contention that July 22, 1998, was when she first suspected the BOPU was the source of the incoming water is contrary to the evidence presented in the record. Despite the fact that Ms. Rawlinson's experts later developed a new theory of causation, the statute of limitations still applies. We conclude that Ms. Rawlinson discovered an "act, error or omission," which provided the basis of the claim against the BOPU, when she discovered the property damage caused by the water seepage in June of 1995.

*Rawlinson,* ¶ 16, 17 P.3d at 17. See also, *Redland v. Tharp,* 498 P.2d 1240, 1241–42 (Wyo.1972) (applying discovery rule to seepage claim).

[¶ 18] In the case at bar, the district court accepted Appellees' contention that the Reeds discovered the cause of action in November of 1999. That was based, at least in part, on the testimony of the real estate agent, Mr. Metzler, who said he told the Reeds that the basement took water during the irrigation season. The Reeds denied that Metzler revealed that information to them. The Johnsons' disclosure apparently was only to the effect that the basement would take water if the yard was flooded in order to irrigate it. The inspection report indicated that some work on roof drainage and yard grading might alleviate the problem, but made no suggestion that the cause was stray irrigation water.

[¶ 19] The record also includes evidence which suggests an even earlier date of discovery. An affidavit of Mr. Burgener, a prior owner of the Reed property and the son of the original owner of the home, suggests his family had been on notice for a very long time that the basement leaked during irrigation season. They had taken steps to correct the problem, but when their efforts failed, they simply employed measures to mitigate the damage from the water. For example, they placed the appliances which were kept in the basement, such as freezers, a meat cutting table, etc., on concrete blocks to protect them from the water. Thus, under the rationale of *Waid* and *Rawlinson,* an argument could be made that the Burgeners had discovered a claim if the water seepage was the result of improper design of the Appellees' irrigation system. These are issues of fact which will have to be resolved as the evidence develops.

[¶ 20] The fact that a property is sold and a subsequent buyer thereafter rediscovered the seepage does not resurrect a stale claim. There are various ways of characterizing this legal principle, including whether the subsequent purchaser has standing to bring the issue, the time of accrual of a cause of action, and/or the time of the discovery of the wrong. See, e.g., *Krusi v. S.J. Amoroso Construction Company, Inc.* 81

Cal.App.4th 995, 97 Cal.Rptr.2d 294 (2000). Regardless of how the issue is characterized, the legal principle holds that, when a prior property owner discovers or reasonably should discover a claim of improper design or construction, the statute of limitations begins to run, and the fact that the property changes hands does not resurrect a stale claim. Of course, if ownership of the property transfers after the discovery of the defect but before the expiration of the limitations period, then the subsequent owner will be able to maintain that cause of action. See, e.g., *ABC Builders, Inc.* 632 P.2d 925, 939–40 (Wyo.1981) (discovery of cause of action for negligent home site selection occurred when prior owner noticed water leaks, but action by subsequent owner against the builder within the limitations period was approved). Subsequent purchasers of the property damaged by long term seepage presumably pay a lower price for the property. Of course, if the seller violates a duty to inform the purchaser of the defect, the purchaser may have a claim against his vendor and/or the seller's realtor for misrepresenting the condition of the property, provided they knew or reasonably should have known of the defect.[2] *Id.;* also see *Rawlinson v. Greer,* 2003 WY 28, 64 P.3d 120 (Wyo.2003).

[¶ 21] The Reeds claim, in a general fashion, a new trespass occurs each year during the irrigation season, and so a new statute of limitations begins to run each and every year such a trespass occurs. This concept is known in the law as a continuing trespass or continuing tort. See *Taylor Ditch Company, Inc. v. Carey,* 520 P.2d 218, 227 (Wyo.1974) (quoting 11 Wright and Miller, *Federal Practice and Procedure: Civil* § 2944, at 397) (injury of continuing nature counsels that equitable relief is appropriate); *Hoery v. United States,* 64 P.3d 214, 217–223, see esp. fn.6 at 218 (Colo.2003) (continuing migration of toxic pollution constitutes continuing trespass or nuisance, but recognizing it had treated irrigation ditches differently in some circumstances); *Holland v. City of Geddes,* 2000 SD 71, 610 N.W.2d 816 (S.D.

---

**2.** This statement is made only to further the legal analysis of this issue. We do not mean to suggest that the Reeds do or do not have a claim against the vendor and/or realtor involved in their purchase of the property.

2000) (city's failure to repair broken water valve was a continuing tort suspending limitations period until valve was fixed); and *Wilson v. Amoco Corporation*, 33 F.Supp.2d 981, 983–84 (D.Wyo.1998) (recognizing rule articulated in *Taylor Ditch*). We discussed the continuing tort concept in *Taylor Ditch Company, Inc.*, 520 P.2d 218, at 224–25:

> The trial court found, and from our examination of the record we think properly, that until 1962 there was no difficulty with the ditch in the vicinity of the Carey property; that after the relocation of the curve it was the much closer to the Carey home; that some 75 feet of the ditch at this point were constructed in moderately pervious material indicating the need of extra care; that extra care was originally taken in the installation of a polyethylene lining at this point of the ditch but that the ditch was compacted only to the extent that would result from heavy equipment running over the area in the course of the earth-moving and relocation work; and that repairs were made from time to time and when such repairs were made the water level went down in certain test or observation holes drilled in the area. It was said that the company.

> 'should have either lined the canal, dug it out and properly compacted it, put material in this particular area, wherever it may be, and certainly they could extend it to cover any area that might even be inspected. They could have done this. They didn't choose to do it. If they had even compacted the 75–foot of moderate perviousness as indicated by [an expert witness], maybe that would have at least helped it. This is indicated especially where the old fill was made and the direction of realignment of the new ditch was changed.'

> ....

> There is therefore no question from the evidence but that a liner was installed at the time the curve was relocated and that this has been permitted to deteriorate. This liner was installed by the partners as part of their relocation work but it is not questioned that the ditch company knew of its installation and the deterioration there-

of. The ditch was inspected on at least an annual basis and quite a bit more frequently in the curve area, quite often referred to as the slide area. The duty to maintain is, we think, a continuing one and there is sufficient evidence in the record to justify the conclusion that the ditch company, although it did not itself construct the ditch, either permitted it to be relocated in or continued to operate it in soil which it knew or should reasonably have known to be naturally of questionable capability to hold water, and although efforts may have been taken in the first instance to prevent seepage therefrom, those efforts were not effective or were not continued, so that the ditch company has not made all reasonable effort to prevent seepage therefrom. Under the ruling in [*Howell v. Big Horn Colonization Company*, 14 Wyo. 14, 81 P. 785 (1905) ], failing to do so, it was negligent.

In *Taylor Ditch*, the ditch company did not use reasonable care in maintaining the ditch or the liner and was accountable to its neighbors for its negligence. 520 P.2d at 224–25.

[¶ 22] This Court reached a similar decision in *ABC Builders, Inc.*, regarding the owners' claim against the City of Sheridan. 632 P.2d at 943. The property owners claimed the City was negligent for failing to maintain a drainage ditch. We upheld the jury's finding of negligence and remarked that the City of Sheridan had an ongoing duty to maintain the ditch and it breached its duty by allowing natural vegetative growth and trash to accumulate in the ditch which restricted the free flow of the water. *Id.* Thus, if the wrongful act alleged by the Reeds is the breach of a duty which occurs on a periodic or seasonal basis, then the concept of continuing tort may apply to their claim. See *Young v. Young*, 709 P.2d 1254, 1259 (Wyo.1985). Again, these are factual questions which must be resolved by the fact finder.

[¶ 23] Another possible source of the encroaching water suggested by the record in this case is simply the rising water table which results from irrigation of the surrounding lands. The traditional laws of negligence apply to this situation as well.

It often happens that the irrigation of upper lands has the effect of causing seepage to the lands of those lying below. Here, again, the liability of the upper owner for damages resulting from such seepage depends upon his negligence, as is the cause where the seepage is directly from the ditches or canals.... And, when the lower land becomes soaked and too wet from the seepage from irrigated lands, the upper land owners can not be held liable, when they use ordinary and reasonable care in the irrigation of their lands, and when they use no more water than is reasonably necessary in so doing. But the land owner who, in irrigating his land, uses more water than is necessary, and permits the water to form in pools thereon, and from thence to seep and percolate to his neighbor's land, is guilty of negligence and is liable for the injuries sustained.

3 *Kinney on Irrigation and Water Rights* § 1675 at 3089 (2nd ed.1912). If the source of the seeping water is the rising ground water table, then the Reeds would be charged with proving that the Appellees do not use sound irrigation practices and apply too much water to the land on a yearly basis and/or do not make suitable provision for transporting surplus or waste water away. If there is evidence of such a charge, then the wrongful act could certainly be considered to be a continuing tort, which the Appellees commit on a yearly basis. If, however, the Appellees' irrigation practices fall within the realm of sound irrigation practices, then the simple fact that the Reeds suffer damage as a result of the invading water will not result in liability on the part of the Appellees.

## CONCLUSION

[¶ 24] There are numerous issues of material fact which must be resolved before the appropriate statute of limitations may be applied in this case. The order of the district court is, therefore, reversed, and this matter is remanded to the district court for proceedings consistent with this opinion.