**In the Matter of the ADOPTION OF CAM, a Minor.**

**MKG, Appellant (Respondent),**

v.

**CM, Appellee (Petitioner).**

**No. C–93–2.**

Supreme Court of Wyoming.

Oct. 29, 1993.

Carol A. Serelson, Cheyenne, for appellant.

Maynard D. Grant of Grant & Newcomb, Cheyenne, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

MACY, Chief Justice.

The adoptive father appeals from the district court's order vacating a final decree of adoption which had granted his adoption of the natural father's son.

We affirm.

The adoptive father poses the following issues for our consideration:

I. Whether the trial court erred when it ruled that [the adoptive father] was required to use due diligence in attempting to locate [the natural father] prior to serving by publication.

II. Whether the trial court erred when it ruled that the [adoptive father] failed to exercise due diligence in attempting to locate [the natural father] prior to serving by publication.

The natural father and the mother were married in Oklahoma City, Oklahoma, in 1979, and the son was born in December 1980. The family lived in Oklahoma until October 1981, when it moved to Fort Collins, Colorado. The family returned to Oklahoma in December 1981. The natural father and the mother separated shortly thereafter. The natural father remained in Oklahoma, and the mother moved back to Fort Collins in early 1982. Following their separation, the parents informally arranged for liberal visitations with their son. Each parent had custody of the son for approximately six months during the first year after their separation.

In June 1982, the mother filed for a divorce from the natural father in the district court for Larimer County, Colorado. The court eventually dismissed the petition for lack of prosecution. Apparently, the mother did not realize that a divorce had not been granted because she married the adoptive father in Fort Collins on December 1, 1982. Following their marriage, the mother and the adoptive father lived in Cheyenne, Wyoming, where the adoptive father was stationed at F.E. Warren Air Force Base. In February 1983, the Air Force transferred the adoptive father to

Germany for four years. The mother and the son also moved to Germany.

The mother and the son lived with the adoptive father in Germany for the first two years of his tour of duty, and they returned to the United States in 1985. In 1986, the mother and the adoptive father became estranged. The mother became involved with drugs during this time and was unable to care for the son. The adoptive father's parents obtained temporary custody of the son while the mother was unable to care for him. In May 1987, the adoptive father completed his tour of duty in Germany and returned to Wyoming. The son joined him in Wyoming a few months later.

On December 3, 1987, the adoptive father petitioned the district court for Laramie County, Wyoming, to adopt the son, and the mother filed her consent to the adoption. The adoptive father served the natural father with notice of the petition by publishing a notice in a Cheyenne newspaper. According to an affidavit filed with his petition, the adoptive father and his attorney could not ascertain the natural father's whereabouts. On February 19, 1988, the district court entered a final decree of adoption granting the care and custody of the son with all attendant rights and responsibilities to the adoptive father. The natural father was unaware that the adoption proceedings were being conducted.

The natural father's last contact with his son was in January 1983 when he flew from Oklahoma City to Denver with the son to return him to his mother and the adoptive father. At this time, the natural father was not aware that the mother and the adoptive father were married. Nor did he know what the adoptive father's last name was. The natural father first learned of the mother's remarriage in March 1983 when his mother-in-law informed him that the mother had remarried and moved from Fort Collins. The mother-in-law would not tell the natural father where the mother had moved, and she told him in a letter not to bother her family anymore. In the fall of 1991, the natural father first learned what the adoptive fa-

ther's name was and that the mother had died. The natural father contacted the adoptive father to request permission to visit with his son. The adoptive father refused. The natural father subsequently received a letter from his mother-in-law informing him that the son had been adopted and that it would not be appropriate for him to visit the son.

On February 27, 1992, the natural father filed a petition to vacate the adoption decree. The district court granted the petition on November 17, 1992, reasoning that the natural father's due process rights were violated because the adoptive father failed to exercise reasonable diligence in attempting to ascertain the natural father's whereabouts prior to making service by publication.

The adoptive father's first issue on appeal is whether the district court erred when it found that due diligence was required prior to making service by publication. He argues that the applicable statute, WYO.STAT. § 1–22–107(a) (1988), did not require him to exercise due diligence when he was attempting to locate the natural father. Section 1–22–107(a) provides:

> (a) Prior to the hearing a copy of the petition to adopt a child and all orders to show cause shall be served on any persons whose consent to adoption is required by W.S. 1–22–109 and whose consent has not been filed with the petition to adopt. Service shall be made in the same manner as provided for by rule 4 of the Wyoming Rules of Civil Procedure and shall be accomplished so that a default judgment could be rendered at the hearing against the person served. Service by publication is specifically allowed where the defendant resides out of state, *or* his residence cannot, with reasonable diligence, be ascertained.

(Emphasis added.) The adoptive father contends, relying upon *Voss v. Ralston,* 550 P.2d 481, 485 (Wyo.1976), that the first clause of the last sentence is a separate alternative which does not require due diligence since that clause is separated from the remaining clause in that sentence by

the disjunctive "or." We disagree because that interpretation is inconsistent with a plain reading of the statute.

Section 1–22–107(a) plainly adopts the requirements of W.R.C.P. 4 when it provides: "Service shall be made in the same manner as provided for by rule 4 of the Wyoming Rules of Civil Procedure." Before its revision in 1992, W.R.C.P. 4(f) provided in part:

(f) *Requirements for service by publication.*—Before service by publication can be made, an affidavit of the party, his agent or attorney, must be filed stating that service of a summons cannot be made within this state, on the defendant to be served by publication, and stating his address, if known, or that his address is unknown and cannot with reasonable diligence be ascertained....

W.R.C.P. 4(f) clearly required the serving party to exercise reasonable diligence when he was attempting to ascertain a nonresident's address prior to making service by publication. Consequently, if service pursuant to § 1–22–107 were to be made in the same manner as required by W.R.C.P. 4, the serving party would have to exercise reasonable diligence when he was attempting to locate the nonresident's address.

The adoptive father's second issue is whether, if due diligence was required, the district court erred in finding that he had failed to exercise such diligence in attempting to locate the natural father. In *Colley v. Dyer,* 821 P.2d 565, 568 (Wyo.1991), we defined due diligence as being

" 'that which is reasonable under the circumstances and not all possible diligence which may be conceived. Nor is it that diligence which stops just short of the place where if it were continued might reasonably be expected to uncover an address ... of the person on whom service is sought.... Due diligence must be tailored to fit the circumstances of each case. It is that diligence which is appropriate to accomplish the end sought and which is reasonably calculated to do so.' "

*Carlson [v. Bos],* 740 P.2d [1269,] 1277 n. 13 [ (Utah 1987) ] (quoting *Parker v.*

*Ross,* 117 Utah 417, 217 P.2d 373, 379 (1950)).

Applying *Colley*'s definition of due diligence to the facts of this case, we conclude that the adoptive father failed to make a diligent effort to locate the natural father. At the hearing on the petition to vacate the adoption, the adoptive father explained his efforts to locate the natural father:

Q. [The adoptive father], what reasonable, probable efforts did you make to ensure that [the natural father] knew that you were going to adopt ...—you were going to adopt [the son]?

A. What did I do to ensure that he was notified?

Q. Yes.

A. I followed what my lawyer had told me to do, which was to take out an ad in the newspaper.

Q. And that's the only thing you did?

A. And whatever else. That was it. That's all I can recollect right now.

Q. Well, do you want a minute to reflect on that?

Is there any possibility that you did anything else besides put an ad in the newspaper?

A. Besides look in the phone directory down in Fort Collins, that was the extent of it.

The adoptive father also testified that he questioned the mother about the natural father's whereabouts but that she was unresponsive due to her involvement with drugs.

The district court found that merely questioning his wife as to the natural father's location and examining the Fort Collins telephone directory did not constitute due diligence. We agree. Several factors indicated that the Oklahoma City area was the logical place to locate the natural father. The adoptive father knew that the son visited his natural father in Oklahoma City during the summer of 1982. During that same summer, the adoptive father traveled to Oklahoma City for a wedding, and during his visit he met the natural father in Midwest City, which is a suburb

of Oklahoma City. In January 1983, the natural father flew from Oklahoma City to the Denver airport with the son to return him to his mother. As stated by the district court: "It makes no sense to limit the search to Ft. Collins when the last actual contact took place at the airport with [the natural father] flying from Oklahoma City."

The adoptive father also could have attempted to contact the natural father's relatives. While the adoptive father was in Oklahoma City during the summer of 1982, he and the mother visited Tommy Leisy, the natural father's cousin, at his house. Even though the adoptive father was under the erroneous impression that Mr. Leisy was the son's uncle, attempting to contact Mr. Leisy in order to discover the natural father's address would have been logical.

 Under the *Colley* test, the adoptive father was not required to exercise all conceivable diligence prior to making service by publication but rather was required to exercise that diligence which was reasonable under the circumstances. That meant making sincere efforts to secure the natural father's address. *TG v. Lee (Interest of SVG)*, 826 P.2d 237, 242 (Wyo.1992). The adoptive father failed to exercise the requisite level of diligence in this case when he made no effort to locate the natural father in the Oklahoma City area.

Affirmed.