# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 127

APRIL TERM, A.D. 2015

September 17, 2015

ROBERT L. KROENLEIN TRUST by
and through DEBORAH ALDEN,
Successor Trustee, and CHUGWATER
BREWING COMPANY, INC., a
Wyoming Corporation,

Appellants
(Plaintiffs),

v.                                                              S-14-0296

GARY BRUCE KIRCHHEFER,
COMMODORE BAR, INC., RICK L.
BOWEN, SILVER DOLLAR BAR OF
LUSK, LLC., and LARRY H.
HALLIGAN

Appellees
(Defendants).

*Appeal from the District Court of Goshen County*
*The Honorable William J. Edelman, Judge*

*Representing Appellants:*
> Patrick J. Crank of Crank Legal Group, P.C., Cheyenne, WY.

*Representing Appellees:*
> Matthew R. Sorenson and Madison M. Brown of Daly & Sorenson, LLC, Gillette, WY for Appellee Gary B. Kirchhefer; and Frank J. Jones, Wheatland, WY, for Appellees Commodore Bar, Inc. and Rick L. Bowen; and Robert Todd Ingram and Scott J. Olheiser of Ingram/Olheiser, P.C., Casper, WY, for Appellees Silver Dollar Bar of Lusk, LLC and Larry R. Halligan.  Argument by Ms. Brown.

*Before BURKE, C.J., and HILL, *KITE, DAVIS, and FOX, JJ.*

\* Justice Kite retired from judicial office effective August 3, 2015, and pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2015) she was reassigned to act on this matter on August 4, 2015.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL,** Justice.

[¶1]    Plaintiffs, the Robert L. Kroenlein Trust and Chugwater Brewing Co., Inc., brought an action against Defendants alleging claims for conversion and fraud arising out of Defendant Gary Kirchhefer's alleged theft of beer from Plaintiffs' store and his subsequent sale of that stolen beer to the other named Defendants.  The district court found Plaintiffs' claims barred by the governing statutes of limitation and granted Defendants' motion for summary judgment.  In so ruling, the district court applied the discovery rule, found no disputed issues of material fact, and concluded that based upon when Plaintiffs knew or should have known of their losses, the four-year statutes of limitation for fraud and conversion barred their action.  The district court further concluded that the doctrine of collateral estoppel barred Plaintiffs from litigating the question of when the statutes of limitation began to run because a federal court had dismissed Plaintiffs' federal claims as time-barred based on application of the discovery rule.

[¶2]    On appeal, Plaintiffs contend that the district court erred in applying the discovery rule to the fraud and conversion statutes of limitation.  Alternatively, they contend that if the discovery rule does apply, the doctrine of collateral estoppel is inapplicable and disputed issues of fact precluded summary judgment.  We hold that the discovery rule does apply to the fraud and conversion statutes of limitation.  We agree with Plaintiffs, however, and conclude that the doctrine of collateral estoppel does not apply and that disputed issues of fact precluded summary judgment.  We therefore reverse.

## ISSUES

[¶3]    Plaintiffs frame the issues on appeal as follows:

> I.    Does the "discovery rule" apply to W.S. § 1-3-106 which explicitly provides that a plaintiff's cause of action does not accrue until "the wrongdoer is discovered?"
>
> II.    Did the trial court correctly rely on the doctrine of collateral estoppel in granting summary judgment?
>
> III.    Has the trial court failed to follow decisions of this Court by failing to recognize that Defendants engaged in a series of continuing tortious acts?

## FACTS

[¶4]    J&B Package Liquor (J&B) is a liquor store located in Torrington, Wyoming.  J&B was originally owned by the Robert L. Kroenlein Trust (Kroenlein Trust), and prior

to November 2004, was operated and managed by Robert Kroenlein and his wife, Betty Kroenlein. In November 2004, both Robert and Betty Kroenlein passed away and their daughter, Deborah Alden, became the successor trustee of the Kroenlein Trust. The Kroenlein Trust assets were distributed in December 2005, and at that time, Ms. Alden received ownership of J&B. In March 2006, Ms. Alden transferred ownership of J&B to Chugwater Brewing Company, Inc., a Wyoming corporation owned by Ms. Alden and her husband, Eric Alden.

[¶5]   Eric Alden is an attorney, and at the time of his in-laws Robert and Betty Kroenlein's deaths in 2004, he was serving as the Platte County Attorney and living and working in Wheatland, Wyoming. Mr. Alden acted as attorney for the estates of Robert and Betty Kroenlein, and from the date of their deaths in November 2004 until his term as Platte County Attorney ended at the close of 2006, Mr. Alden oversaw J&B's operations from Wheatland. In particular, from November 2004 to the close of 2006, Mr. Alden would usually speak daily with J&B's manager, Margaret Hauf, and on weekends he would travel to Torrington to check in on the store. Mr. Alden also met with J&B's accountant every few months during this period.

[¶6]   In mid-2005, Mr. Alden found inconsistencies in some of J&B's accounting reports. Specifically, Mr. Alden observed that in some months, the amounts J&B was spending on beer purchases exceeded the revenue J&B derived from beer sales. These discrepancies continued off and on through 2005 and 2006, and Mr. Alden took a number of steps in an effort to identify the cause of the beer losses, including discussions with J&B's bookkeeper, review of the manner in which beer sales were keyed into the register and adjustments to that procedure, review of beer delivery schedules and its impact on revenue reports, and review of video taken by J&B's existing videotape recording system.

[¶7]   In January 2007, Mr. Alden moved to Torrington. J&B's accounting reports continued to reflect beer shortfalls, and Mr. Alden continued to investigate the cause of these losses. J&B had one distributor that delivered Coors products to the store and another distributor, Orrison Distributing (Orrison), that delivered Budweiser and Miller products to the store. By the end of the summer of 2007, Mr. Alden had concluded that the shortfall stemmed from the Orrison deliveries. In October 2007, Mr. Alden had additional surveillance cameras installed to monitor the back of the store where Orrison deliveries were made. With that surveillance system, Mr. Alden discovered that Defendant Gary Kirchhefer, an Orrison employee, was stealing beer paid for by J&B and intended for delivery to J&B. In its order dismissing Plaintiffs' federal claims, the federal district court described the scheme to which Defendant Kirchhefer admitted:

> As the beer salesman, Kirchhefer would order (presale) the beer for J & B Liquors the day before it was delivered, making an electronic order via his computer to Orrison. The

2

following day a delivery truck driver for Orrison would off-load the beer in the alley next to the back door of J & B Liquors. Kirchhefer would then arrive and dismiss the delivery driver and "kindly" take what J & B actually needed into the store coolers and put the excess beer, ordered and paid for by J & B, into his van. Kirchhefer would then take the beer he had stolen from J & B Liquors and give it away to customers in exchange for keeping and ordering some of the less popular products, such as Tequiza or sell it.

*Robert L. Kroenlein Trust v. Kirchhefer*, 2013 WL 1337385, * 2 (D. Wyo. 2013) (citations omitted).

[¶8]   On August 15, 2011, Plaintiffs filed a complaint against Defendants in the federal district court for the district of Wyoming. The complaint asserted federal claims for violation of the Racketeer Influenced and Corrupt Organization Act (RICO) and state claims for conversion and fraud. On March 31, 2013, the federal district court granted Defendants summary judgment on the federal claims, finding that as a matter of law those claims were time-barred. The court reasoned:

> Plaintiffs assert that it was only upon Kirchhefer's arrest and subsequent interview that they learned of Bowen and Halligan's "involvement" and scheme. However, as noted in *Dummar v. Lummis*, 543 F.3d at 621, a plaintiff need not be aware of the pattern of racketeering activity before the statute of limitations begins to run. Moreover, Plaintiffs' argument was expressly, if not implicitly rejected in *Rotella v. Wood*, 528 U.S. 549 (2000) (discovery of injury caused to the business triggers start of statute of limitations not discovery of other elements of claim—such as pattern of RICO activity). The undisputed facts establish that in the Fall of 2005 Plaintiffs were aware of the injury to their business and, had they then exercised due diligence, they would have known of their cause of action. Accordingly, having failed to bring their RICO claims until August 15, 2011, they are barred by the four-year statute of limitations.

*Robert L. Kroenlein Trust*, 2013 WL 1337385, * 8.

[¶9]   The federal court entered its summary judgment order on March 31, 2013. The federal court's order did not address the statutes of limitation for the state law claims for conversion and fraud, and the court dismissed those claims without prejudice. *Kroenlein*, 2013 WL 1337385, * 9. On April 10, 2013, Plaintiffs filed a complaint in the state

district court for the Eighth Judicial District asserting claims against Defendants for conversion and fraud. Through their complaint, Plaintiffs alleged that Defendant Kirchhefer stole approximately $337,326.00 in Orrison products from J&B during the years 2002 through 2007.

[¶10] Defendants filed separate motions for summary judgment and joinders in each others' motions, and then on June 9, 2014, Defendants filed a joint motion for summary judgment. They argued: 1) Plaintiffs' fraud claim was barred by the statute of limitations because Plaintiffs could have, with a reasonably diligent investigation, discovered the fraud as early as 1997; 2) Plaintiffs' conversion claim was barred by the statute of limitations because they could have discovered the wrongdoing as early as 2002; 3) the doctrine of continuing torts does not apply; and 4) the doctrine of collateral estoppel bars Plaintiffs from re-litigating the discoverability of the beer conversion and the failure to exercise reasonable diligence to discover the beer theft. Plaintiffs opposed the summary judgment motions, asserting, among other arguments, that the discovery rule does not apply to the statutes of limitation for conversion and fraud and that the Wyoming Supreme Court decisions holding otherwise should be overturned.

[¶11] On October 14, 2014, the district court entered its Order Granting Summary Judgment. The district court rejected Plaintiffs' argument concerning the applicability of the discovery rule, and without recitation of the particular undisputed facts and supporting evidence the court found material to its decision, the court concluded:

> Plaintiffs knew that they had been injured years before they made any efforts to discover by whom. In fact, they were put on notice by their accountant – arguably a rather reliable source of information in matters involving discrepancies in bookkeeping – several years before they took any steps to locate the source of the discrepancy. It took several additional years for them to take inventory of their goods, yet Plaintiffs state had it not been for their "extraordinary investigative efforts" the wrongdoer would never have been discovered. This Court reaches the same conclusion as the Federal District Court regarding the facts of this case and the discovery of Defendant Kirchhefer's actions. The scheme employed by Kirchhefer was not complex, certainly was not carried out in hiding, and was easily discoverable by Aldens, had they chosen to look. Thus, this Court finds the statute of limitations has run, because the Plaintiffs knew or should have known of the claim well before four years prior to commencement of this action.
>
> Moreover, this Court holds Plaintiffs are precluded from litigating the above issues anyway as they were recently

4

determined by the Federal District Court, and such determination triggered the application of the doctrine of collateral estoppel. The Wyoming Supreme Court has noted collateral estoppel applies when "a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies." *Goodman v. Voss*, 2011 WY 33, 248 P.3d 1120, 1126 (Wyo. 2011). In the present case, the parties to the Federal action were identical, the issues of both the discovery of the fraud and the actions of the parties were determined on the merits by the Federal District Court after affording the parties an opportunity to be heard; therefore, this Court is not at liberty to allow Plaintiffs the opportunity to relitigate this case.

[¶12] On November 12, 2014, Plaintiffs timely filed their notice of appeal to this Court.

## STANDARD OF REVIEW

[¶13] Our standard for reviewing a district court's entry of summary judgment is well established:

We review a summary judgment in the same light as the district court, using the same materials and following the same standards. [*Snyder v. Lovercheck*, 992 P.2d 1079, 1083 (Wyo.1999)]; *40 North Corp. v. Morrell*, 964 P.2d 423, 426 (Wyo.1998). We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Id*. A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. *Id*. If the moving party presents supporting summary judgment materials demonstrating no genuine issue of material fact exists, the burden is shifted to the non-moving party to present appropriate supporting materials posing a genuine issue of a material fact for trial. *Roberts v. Klinkosh*, 986 P.2d 153, 155 (Wyo.1999); *Downen v. Sinclair Oil Corp.*, 887 P.2d 515, 519 (Wyo.1994). We review a grant of summary judgment deciding a question of law de novo and afford no deference to the district court's ruling. *Roberts v. Klinkosh*, 986 P.2d at 156; *Blagrove v. JB Mechanical, Inc.*, 934 P.2d 1273, 1275 (Wyo.1997).

5

*Moats v. Prof'l Assistance, LLC*, 2014 WY 6, ¶ 17, 319 P.3d 892, 896 (Wyo. 2014) (quoting *DiFelici v. City of Lander*, 2013 WY 141, ¶ 7, 312 P.3d 816, 819 (Wyo. 2013)).

[¶14] Questions of statutory interpretation are questions of law that we review de novo. *Adekale v. State*, 2015 WY 30, ¶ 12, 344 P.3d 761, 765 (Wyo. 2015) (citing *Crain v. State*, 2009 WY 128, ¶ 8, 218 P.3d 934, 938 (Wyo. 2009)).

## DISCUSSION

[¶15] We address first Plaintiffs' argument that, by statute, a claim for fraud accrues only upon a plaintiff's actual discovery of the fraud and a claim for conversion accrues only upon a plaintiff's actual discovery of the wrongdoer, and the district court therefore erred in applying the discovery rule and its due diligence requirement. We will then turn to Plaintiffs' remaining issues, including whether questions of fact precluded summary judgment on the application of the discovery rule and whether the district court erred in applying the doctrine of collateral estoppel.

## A.      Applicability of the Discovery Rule

[¶16] "Wyoming is a discovery jurisdiction, which means that a statute of limitation is triggered when a plaintiff knows or has reason to know of the existence of a cause of action." *Redland v. Redland*, 2012 WY 148, ¶ 54, 288 P.3d 1173, 1186 (Wyo. 2012) (quoting *Carnahan v. Lewis*, 2012 WY 45, ¶ 27, 273 P.3d 1065, 1073 (Wyo. 2012)). In other words, the discovery rule triggers a statute of limitation "when a reasonable person should have been placed on notice of his claim." *Moats*, ¶ 21, 319 P.3d at 897 (quoting *Heimer v. Antelope Valley Improvement*, 2010 WY 29, ¶ 18, 226 P.3d 860, 864 (Wyo. 2010)). The discovery rule applies where a statute of limitation either expressly adopts the rule or specifies that a limitation period runs only after the cause of action accrues. *Corkill v. Knowles*, 955 P.2d 438, 443 (Wyo. 1998).

[¶17] A civil action for fraud or conversion must be brought within four years after the cause of action accrues. Wyo. Stat. Ann. § 1-3-105(a)(iv)(B), (D) (LexisNexis 2015). Because the statutes of limitation for conversion and fraud claims run from their date of accrual, this Court has consistently applied the discovery rule to determine when the limitation period began to run. *See, e.g., Erdelyi v. Lott*, 2014 WY 48, ¶ 26, 326 P.3d 165, 172 (Wyo. 2014) (applying discovery rule to fraud claim); *Lieberman v. Mossbrook*, 2009 WY 65, ¶¶ 22-23, 208 P.3d 1296, 1304 (Wyo. 2009) (applying discovery rule to conversion claim); *Retz v. Siebrandt*, 2008 WY 44, ¶ 12, 181 P.3d 84, 89-90 (Wyo. 2008) (applying discovery rules to conversion and fraud claims); *Cross v. Berg Lumber Co.*, 7 P.3d 922, 930 (Wyo. 2000) (applying discovery rule to conversion claim); *Taylor v. Estate of Taylor*, 719 P.2d 234, 239 (Wyo. 1986) (applying discovery rule to fraud

6

claim); *Mason v. Laramie Rivers Co.*, 490 P.2d 1062, 1064 (Wyo. 1971) (applying discovery rule to fraud claim).

[¶18]  Plaintiffs contend that this Court has erred in applying the discovery rule to fraud and conversion claims.  In so arguing, Plaintiffs point to the language of Wyo. Stat. Ann. § 1-3-106, which provides:

> A cause of action for the wrongful taking of personal property is not deemed to have accrued ***until the wrongdoer is discovered***. A cause of action on the ground of fraud is not deemed to have accrued ***until the discovery of the fraud***.

Wyo. Stat. Ann. § 1-3-106 (LexisNexis 2015) (emphasis added).

[¶19]  Plaintiffs argue that in applying the discovery rule to fraud and conversion claims, this Court has done so with little true analysis and no consideration given to the language of Wyo. Stat. Ann. § 1-3-106.  Plaintiffs further argue that pursuant to the plain terms of section 106, claims for conversion and fraud do not accrue until, for conversion, the wrongdoer is <u>actually</u> discovered, and for fraud, until the <u>actual</u> discovery of the fraud.  We disagree both with Plaintiffs' premise that this Court's application of the discovery rule has been without consideration of the language used in section 106 and with Plaintiffs' proffered interpretation of the terms "discovered" and "discovery."

[¶20]  First, contrary to Plaintiffs' contention that our application of the discovery rule to fraud and conversion claims has been without consideration of the terms used by the legislature, this Court, in *Mason*, expressly addressed the statutory use of the term discovery as it related to the accrual of a fraud claim.  Indeed, it was in relation to § 1-3-106's predecessor that we interpreted the meaning of the term discovery and explained the basis for our interpretation:

> Section 1-18 in pertinent part provides:
>
> > 'Within four years, an * * * action for relief on the ground of fraud; but the case (sic) of action in such case shall not be deemed to have accrued until the discovery of the fraud.'
>
> The basic principle recognized by plaintiffs and prevailing in most jurisdictions, applicable to both law and equity, is that the statute begins to run in fraud cases when there is discovery by the aggrieved party of the facts constituting the fraud.  Actual knowledge of the fraud will be inferred if the aggrieved party by the exercise of due diligence could have

7

discovered it. Some representative cases out of many in the western states showing its various applications and demonstrating the rule are *Tovrea Land and Cattle Company v. Linsenmeyer*, 100 Ariz. 107, 412 P.2d 47; *Condos v. Felder*, 92 Ariz. 366, 377 P.2d 305; *Bainbridge v. Stoner*, 16 Cal.2d 423, 106 P.2d 423; *Greco v. Pullara*, 166 Colo. 465, 444 P.2d 383; *Gerlach v. Schultz*, 72 Idaho 507, 244 P.2d 1095; *Jones v. Jones*, Okl., 459 P.2d 603; *Widger v. Union Oil Co. of Oklahoma*, 205 Okl. 614, 239 P.2d 789; *Dilley v. Farmers Insurance Group*, 250 Or. 207, 441 P.2d 594; *Heard v. Coffey*, 218 Or. 275, 344 P.2d 751; *Huycke v. Latourette*, 215 Or. 173, 332 P.2d 606; *Taylor v. Moore*, 87 Utah 493, 51 P.2d 222; *Strong v. Clark*, 56 Wash.2d 230, 352 P.2d 183; and *Davis v. Harrison*, 25, Wash.2d 1, 167 P.2d 1015.

We hold that the words 'until the discovery of the fraud' appearing in § 1-18 mean from the time the fraud was known or could have been discovered in the exercise of reasonable diligence. They do not necessarily mean until the party complaining had actual notice of the fraud alleged to have been committed.

*Mason*, 490 P.2d at 1064.

[¶21] The meaning this Court gave the term discovery in *Mason* is reflected in our cases applying the discovery rule to fraud and conversion claims. *See Retz*, ¶ 12, 181 P.3d at 89-90 (citing *Mason* for the meaning of "discovery" when considering conversion claim); *Lieberman*, ¶ 23, 208 P.3d at 1304 (citing *Retz* for the meaning of "discovery" when considering conversion claim); *Erdelyi*, ¶ 26, 326 P.3d at 172 (citing *Retz* and *Mason* for the meaning of "discovery" when considering fraud claim). We thus find it clear that our application of the discovery rule to determine when a claim for fraud or conversion accrues was deliberate and not happenstance. We next consider then whether the meaning we gave the statutory term "discovery" in *Mason* is supported by our principles of statutory interpretation.

[¶22] In any question of statutory interpretation, our primary objective is to give effect to the legislature's intent. *L&L Enters. v. Arellano (In re Arellano)*, 2015 WY 21, ¶ 13, 344 P.3d 249, 252 (Wyo. 2015). "Where legislative intent is discernible a court should give effect to the 'most likely, most reasonable, interpretation of the statute, given its design and purpose.'" *Adekale*, ¶ 12, 344 P.3d at 765 (quoting *Rodriguez v. Casey*, 2002 WY 111, ¶ 20, 50 P.3d 323, 329 (Wyo. 2002)). In light of this objective, we have said:

8

We therefore construe each statutory provision *in pari materia*, giving effect to every word, clause, and sentence according to their arrangement and connection. To ascertain the meaning of a given law, we also consider all statutes relating to the same subject or having the same general purpose and strive to interpret them harmoniously. We presume that the legislature has acted in a thoughtful and rational manner with full knowledge of existing law, and that it intended new statutory provisions to be read in harmony with existing law and as part of an overall and uniform system of jurisprudence. When the words used convey a specific and obvious meaning, we need not go farther and engage in statutory construction.

*Nicodemus v. Lampert*, 2014 WY 135, ¶ 13, 336 P.3d 671, 674 (Wyo. 2014) (citing *Estate of Dahlke ex rel. Jubie v. Dahlke*, 2014 WY 29, ¶¶ 36–37, 319 P.3d 116, 125–26 (Wyo. 2014)).

[¶23] Because our primary consideration in interpreting statutory terms is legislative intent, we look first to the legislature's objectives in creating statutes of limitation. This is not a new question. We have stated:

Statutes of limitation have long been a part of the jurisprudence of the United States, all its states and the State of Wyoming. They are pragmatic devices to save courts from stale claim litigation and spare citizens from having to defend when memories have faded, witnesses are unavailable by death or disappearance and evidence is lost. Statutes of limitation are arbitrary by their very nature and do not discriminate between the just and unjust claim. They are not judicially made but represent legislative and public policy controlling the right to litigate. The statutes operate against even the most meritorious of claims and courts have no right to deny their application. When considering the statute of limitations, the nature of injury, its extent, the amount of money damages involved, social considerations, and the emotional appeal the facts may have must pass to the background. **The circumstances are only significant in the bearing they may have on where the cause of action arose, when it arose and when the time expired for pursing the applicable judicial remedy.**

9

*Nowotny v. L&B Contract Indus.*, 933 P.2d 452, 458 (Wyo. 1997) (quoting *Duke v. Housen*, 589 P.2d 334, 340 (Wyo. 1979)) (emphasis in original).

[¶24] More recently, we have observed:

> The purpose of statutes of limitation is to save courts from stale claim litigation; spare citizens from having to defend when memories have faded, witnesses have died or disappeared and evidence is lost; ***prevent parties from sleeping on their rights; and require diligence***.

*Lieberman*, ¶ 25, 208 P.3d at 1305 (citing *Swinney v. Jones*, 2008 WY 150, ¶ 7, 199 P.3d 512, 515 (Wyo. 2008)) (emphasis added).

[¶25] The meaning this Court gave the term discovery in *Mason* is consistent with these legislative objectives. Interpreting discovery to mean the time the fraud or conversion, or in the case of conversion, the identity of the wrongdoer, was actually discovered or could have been discovered in the exercise of reasonable diligence serves the goals of requiring parties to be diligent in pursuing their claims and avoiding litigation of stale claims. On the other hand, the interpretation Plaintiffs advocate would leave reasonable diligence out of the equation and allow a party to pursue a stale claim that could have been brought earlier with the exercise of reasonable diligence, contrary to the objectives of a statute of limitations.

[¶26] We find additional support for the meaning we have assigned the terms "discovered" and "discovery" in our presumption "that the legislature has acted in a thoughtful and rational manner with full knowledge of existing law, and that it intended new statutory provisions to be read in harmony with existing law and as part of an overall and uniform system of jurisprudence." *Nicodemus*, ¶ 13, 336 P.3d at 674. Wyoming has long been a discovery state, meaning a statute of limitations is triggered when a party knows or should know his claim has accrued. *See Nowotny*, 933 P.2d at 456 ("The acceptance of the discovery rule in Wyoming is attributed to *Duke v. Housen*, 589 P.2d 334 (Wyo. 1979)[.]"). Wyo. Stat. Ann. § 1-3-106 does nothing more than define when conversion and fraud claims accrue. It does not speak to when the triggering discoveries are deemed to have been made, and it contains no terms to preclude application of the discovery rule.

[¶27] Along these same lines, we have held that "[w]hen this Court interprets a statute and the legislature makes no material legislative change in the provision thereafter, the legislature is presumed to acquiesce in the Court's interpretation." *Wyo. Dep't of Revenue v. Qwest Corp.*, 2011 WY 146, ¶ 23, 263 P.3d 622, 629 (Wyo. 2011) (quoting *SLB v. JEO*, 2006 WY 74, ¶ 14, 136 P.3d 797, 801 (Wyo. 2006)). Here again, we have long applied the discovery rule to fraud and conversion claims, and the legislature has

taken no steps to revise the statute to reject that application. We therefore presume that the legislature has acquiesced in our interpretation of § 1-3-106.[1]

[¶28] Finally, we observe that our interpretation of the terms "discovery" and "discovered" is consistent with the interpretation other jurisdictions have given these terms in similar statutes. For example, Ohio has a statute governing the accrual of fraud and conversion claims, which provides that "[i]f the action is * * * for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered." Ohio Rev. Code Ann. § 2305.09(E) (West 2014). The Ohio Supreme Court has interpreted this language to be a statutory incorporation of the discovery rule. *Investors REIT One v. Jacobs*, 546 N.E.2d 206, 211 (Ohio 1989); *see also, e.g., Wilde v. Westland Dev. Co., Inc.*, 2010 NMCA-085, 148 N.M. 627, ¶ 18, 241 P.3d 628, 635 (N.M. Ct. App. 2010) (discovery as used in fraud/conversion claim accrual statute means discovery of such facts as would, on reasonable diligent investigation, lead to knowledge of the fraud or other injury); *Nerco Minerals Co. v. Morrison Knudsen Corp.*, 90 P.3d 894, 901 (Idaho 2004) (discovery as used in fraud claim accrual statute means actual discovery or time fraud could have been discovered with reasonable diligence); *Thomas v. Sifers*, 535 F.Supp.2d 1200, 1206 (D. Kan. 2007) (discovery as used in fraud claim accrual statute means actual discovery or time fraud could have been discovered with reasonable diligence); *Allen v. Lawyers Mut.*

---

[1] Plaintiffs argue against application of this rule of interpretation, and in fact any rule of interpretation, contending that because the Wyo. Stat. Ann. § 1-3-106 is clear and unambiguous, there is no room for this Court to apply rules of interpretation. Although we agree that the statute is clear and unambiguous, we reject Plaintiffs' argument as a misunderstanding of statutory interpretation. There is nothing inconsistent in finding a statute unambiguous and also using our rules of interpretation. We do not use the rules to supplement or change the terms of a statute, but rather to aid in confirming the meaning the legislature intended for the terms it used. We have explained:

> Against this backdrop of "legisprudence (the jurisprudence of legislation)," a useful outline of this court's method of statutory interpretation emerges. We read the text of the statute and pay attention to its internal structure and the functional relation between the parts and the whole. We make the determination as to meaning, that is, whether the statute's meaning is subject to varying interpretations. If we determine that the meaning is not subject to varying interpretations, that may end the exercise, although we may resort to extrinsic aids of interpretation, such as legislative history if available and rules of construction, to confirm the determination.

*Parker Land & Cattle Co. v. Wyo. Game and Fish Comm'n*, 845 P.2d 1040, 1045 (Wyo. 1993) (footnote omitted); *see also Arellano*, ¶¶ 13-21, 344 P.3d at 252-54 (finding provision of workers' compensation act unambiguous but applying rules of interpretation to ascertain its meaning); *Walker v. State*, 2013 WY 58, ¶¶ 21-23, 302 P.3d 182, 188-89 (Wyo. 2013) (finding felony stalking statute unambiguous but applying rules of interpretation to determine its meaning).

*Ins. Co. of Kentucky*, 216 S.W.3d 657, 661-62 (Ky. Ct. App. 2007) (discovery as used in fraud claim accrual statute means actual discovery or time fraud could have been discovered with ordinary diligence); *Gilmore v. Chicago Title Ins. Co.*, 926 S.W.2d 695, 698 (Mo. Ct. App. 1996) (discovery as used in fraud claim accrual statute means actual discovery or time fraud could have been discovered with due diligence); *Fitzgerald v. Cmty. Redevelopment Corp.*, 811 N.W.2d 178, 193-94 (Neb. 2012) (discovery as used in fraud claim accrual statute means discovery of facts sufficient to put a person of ordinary intelligence and prudence on inquiry); *Mountain Land Properties, Inc. v. Lovell*, 46 F.Supp.3d 609, 624 (W.D. N.C. 2014) (discovery as used in fraud claim accrual statute means actual discovery or time fraud could have been discovered with reasonable diligence); *Bixby v. KBR, Inc.*, 895 F.Supp.2d 1075, 1090 (D. Oregon 2012) (discovery as used in fraud claim accrual statute operates in conjunction with discovery rule); *Shiozawa v. Duke*, 2015 UT App. 40, ¶ 13, 344 P.3d 1174, 1179 (Utah Ct. App. 2015) (discovery as used in fraud claim accrual statute means actual discovery or time fraud could have been discovered with reasonable diligence); *Shepard v. Holmes*, 185 Wash.App. 730, ¶ 26, 345 P.3d 786, 790 (Wash. Ct. App. 2014) (statute providing for accrual of fraud claim upon discovery "effectively codifies the discovery rule as the basis on which a claim for fraud * * * accrues").[2]

[¶29] Based on the foregoing, we conclude that pursuant to § 1-3-106, a claim for conversion accrues when a plaintiff actually discovers the wrongdoer's identity or could have discovered that identity through the exercise of reasonable diligence. Likewise, we conclude that a claim for fraud accrues when a plaintiff actually discovers the fraud or could have discovered the fraud through the exercise of reasonable diligence. We thus adhere to our prior decisions holding that the discovery rule applies to the running of the limitation periods for conversion and fraud claims.

## B.     Application of the Discovery Rule

[¶30]  The parties do not necessarily dispute the facts insofar as they concern the manner of Defendant Kirchhefer's theft or the approximate dates when J&B accountants informed Plaintiffs of discrepancies related to beer costs and revenues. They do dispute whether Plaintiffs exercised reasonable diligence in investigating and discovering their claims for conversion and fraud.

[¶31]  The application of the discovery rule is a mixed question of fact and law, making it a difficult candidate for summary judgment:

> The application of the discovery rule to a statute of limitations involves a mixed question of law and fact;

---

[2] In our review of claim accrual statutes from other states that use the term "discovery" to trigger the accrual, we were unable to find any interpretation of the term that differed from the interpretation we have given the term, and Plaintiffs have directed the Court to no such decisions.

> consequently, the entry of summary judgment on the issue of
> when a statute of limitations commences to run is typically
> inappropriate. *See, e.g.*, *Cathcart v. Meyer*, 2004 WY 49,
> ¶ 30, 88 P.3d 1050, 1062–63 (Wyo.2004); *Murphy v. Housel
> & Housel*, 955 P.2d 880, 883 (Wyo.1998). The question can
> only be resolved as a matter of law if uncontroverted facts
> establish when a reasonable person should have been placed
> on notice of his claim. *Hiltz v. Robert W. Horn, P.C.*, 910
> P.2d 566, 569 (Wyo.1996).

*Moats*, ¶ 21, 319 P.3d at 897 (quoting *Heimer v. Antelope Valley Improvement*, 2010 WY 29, ¶ 18, 226 P.3d 860, 864 (Wyo. 2010)).

[¶32] This Court recently addressed what constitutes due diligence in the context of the discovery rule. We defined it as:

> Such a measure of prudence, activity, or assiduity, as is
> properly to be expected from, and ordinarily exercised by, a
> reasonable and prudent [person] under the particular
> circumstances; not measured by any absolute standard, but
> depending on the relative facts of the special case.

*Moats*, ¶ 22, 319 P.2d at 897 (quoting *In Re Estate of Novakovich*, 2004 WY 158, ¶ 27, 101 P.3d 931, 938 (Wyo. 2004)).

[¶33] We stated further in *Moats* that due diligence is that diligence "which is reasonable under the circumstances and not all possible diligence which may be conceived." *Moats*, ¶ 22, 319 P.2d at 897 (quoting *In re Adoption of CAM*, 861 P.2d 1102, 1105 (Wyo. 1993)). "Due diligence must be tailored to fit the circumstances of each case. It is that diligence which is appropriate to accomplish the end sought and which is reasonably calculated to do so." *Id.*

[¶34] Defendants cite to the dates when J&B's accountant informed Plaintiffs of losses on the store's beer sale (as early as 1997 for Robert Kroenlein) and the lack of complexity in Defendant Kirchhefer's thefts to support their argument that Plaintiffs knew or should have known of their fraud and conversion claims by 2002 at the latest. Specifically, Defendants assert that "[a]s operator of the Liquor Store, Kroenlein had reports from his accountant in 2002 showing a loss on beer as well as the Orrison invoices, and access to the inventory−all of the information that he would have relied on in determining fraud." The district court essentially echoed this argument in granting summary judgment, concluding that "[t]he scheme employed by Kirchhefer was not complex, certainly was not carried out in hiding, and was easily discoverable by [the] Aldens, had they chosen to look."

13

[¶35] In contrast to this view that determining the cause of J&B's beer losses was a simple matter of just looking, Eric Alden described, in his affidavit opposing summary judgment, the efforts he undertook to identify the cause of the beer losses. He attested:

3.      In mid-2005, I became aware that the accounting had apparent inconsistencies. The most major of the inconsistencies involved monthly beer costs and income. Some documents I examined showed the amount spent on beer purchases was greater than the revenue derived from the sale of beer. I talked to the bookkeeper at the accounting firm and learned that the beer cost numbers came from a totaling of the invoices from the three beer distributors and the beer income numbers came from a total of the charges run up on the cash register on the "beer" key and an estimated fraction of the bar sales attributed to beer. I suspected that the accounting system was inaccurate. * * *

4.      I first questioned the source of the information used to estimate the fraction of bar sales attributed to beer. This appeared to be a simple guess. I had the store manager and employees keep track of the income from bar sales separating beer sales from liquor sales. Simultaneously, I had the manager determine whether products received from beer distributors was being improperly keyed into the register as liquor products. This was a possibility because certain malt beverage products bear the names of liquor companies. Products like wine coolers, Smirnoff and Bacardi flavored drinks and other flavored drinks like Mike's Hard Lemonade are actually malt beverages and are distributed through beer distributors while wines and Smirnoff vodka and Bacardi rum are distributed through the Wyoming Liquor Commission. If products purchased from beer distributors were being reported as sales of liquor products purchased from the state, then the system would under-report the actual income from beer products.

5.      I instructed the manager to go over the categories of products and make sure all items received from beer distributors were keyed into the register as beer sales and to retrain the staff to make sure this was being done properly. I also had the bar register reset to report beer sales separately from sales of mixed drinks and had the actual numbers reported to the bookkeeper rather than estimates. The next month's report no longer showed beer purchases greater than

beer sales. I thought I had identified and dealt with the problem.

6. Several months later the discrepancy between beer sales and purchases appeared again. Then it went away for two months then it came back again. I looked into the question further. I determined that the schedule of beer deliveries influenced the report. For the suspect months there were only four weekends but there were five Tuesdays. This was significant because most beer was sold on weekends and was delivered and paid for on Tuesdays. A month with only four weekends resulted in lower monthly beer sales and one with more Tuesdays resulted in greater beer costs. Because these months fall on a three month cycle the months with shortage only appeared every third month. I again thought that I had identified the source of the problem.

* * * *

8. In 2006 I received a report for the entire year of 2005 in connection with the tax return. The beer numbers still looked wrong. The income from beer sales was not commensurate with the amount the store was spending on beer. I kept track of the numbers for the first few months of the year and the problem was not happening, then as beer sales increased in the late spring and summer the discrepancies reappeared. I then suspected that this was not simply an accounting problem and might be a theft problem. My initial concern was employee theft. Because I was not sure who might be involved, I did not share my concerns with the store manager or any employees. Instead, I observed employees both when I was present and also on the videotape recording system which was in the store.

* * * *

10. Once I moved to Torrington in January, 2007, I continued to examine the books and observe the activities at the store looking for signs of thefts. As winter ended and the summer season began the beer shortfalls began to appear again, especially in months with five delivery dates. The store was equipped with an old videotape surveillance system which I reviewed with increasing frequency. That system required me to watch an eight hour video tape at a maximum speed of double actual speed so it took four hours to view an eight hour tape. There were two cameras and only one would record at a time so I would watch one or the other every few days.

11. On several occasions during the spring and summer of 2007 I spot-checked the beer deliveries to see if the invoiced amounts were correct. For Coors deliveries I watched the video of the front door during deliveries and counted the beer as it was brought in. For the deliveries coming from Orrison Distributing I counted the beer as it was stacked in the alley from the truck. Because I did not want the thief to know I was investigating, I would count three of four selected items and later compare my count to the invoice presented by Gary Kirchhefer after the delivery was complete. The items I chose to count were the larger orders such as cases of Bud Light bottles or twelve packs of Bud Light cans. I did these spot checks four or five times and the amounts I counted in the alley were always identical to amounts shown on the invoices.

12. As the summer of 2007 went on it appeared that beer was still somehow "leaking" from the store and the amounts were too large to be simply pilferage. I decided that the beer could not be leaving during the day because I would have seen that so I guessed that it was being taken out at night. I hypothesized that the beer must be being taken out of the store after hours. This would have been occurring through the back door because the front door opened on a main street and any activity like that would have been open to observation. Because the back door was secured by a bar on the inside I assumed the thief must have been entering through the front door using a key. Over the years a number of former employees had been entrusted with keys and even though these had all been returned I thought that someone might have duplicated one of them and thereby had access to the store.

13. For several weeks in late July 2007, I went to the store after closing each evening and counted and observed the beer inventory surreptitiously. I would return the next morning and compare the situation with my observations from the night before. On no occasions did I observe any change in the beer status. The only days that I was unable to get a clean count the next morning were the days that deliveries were made. These occurred on Tuesdays and Fridays. On those days the Orrison beer truck was already there before the store opened at 7:00. The truck would arrive around 6:00 and unload beer onto the ground in the alley and as soon as the manager arrived at 6:30 she would open the back door so

16

Gary Kirchhefer could start loading beer into the store while she got ready to open up. The Coors deliveries would come in through the front door starting at 7:00 or a little earlier.

14. At that time I was completely convinced that the "missing" beer was actually arriving at the store and then being secretly taken from the store. I did not imagine that the beer was not being delivered at all. The Orrison deliveries were being made by two employees on the truck. Then Gary Kirchhefer, the regional representative, would arrive as well. I did not believe it possible that multiple employees of Orrison were colluding in diverting the beer. The employees on the truck would change periodically with a different helper assisting the driver. I believed this would prevent any coordinated efforts at theft. Also, Mr. Kirchhefer was a trusted employee of Orrison and a person of good reputation and appearance. Because Orrison had its complete business and reputation at risk, I believed that it would take every precaution to avoid theft problems with its business. I did not and could not believe that my beer supplier was systematically stealing from me.

15. Because I believed the beer was being taken from the store and the only times available for such major thefts were the nightimes (sic) immediately before delivery days I spent the month of August 2007, watching the videotapes of the front door during the hours from closing on Monday and Thursday until opening on Tuesday and Friday each week. This required sitting in the office for four hours watching video twice a week of a door in the dark looking for someone sneaking into the store. Nothing happened on any of these videotapes.

16. By late August 2007, I felt that the store was not being entered at night to steal the beer. In order to confirm that, I decided to surreptitiously inventory the beer at night after closing on the nights before delivery days and then again the next morning and compare the differences to the amounts shown on the invoices. At this point I was still concerned that my manager or one of my employees was involved in the thefts. Because I did not want anyone to know what I was doing I waited until about half an hour after the store closed, then went back to the store and parked in the back where no one could see me. I walked around to the front door and let myself in avoiding turning on any lights. I was concerned that someone, either the thief or the police, would see me in

the store after hours so I went around the store with a flashlight and a pad of paper counting a dozen or so popular packaging items like cases and twelve packs of Bud and Bud Light and Coors. I did this for the last delivery in August and found that while the Coors numbers were identical to the invoiced amounts, the Orrison numbers were not. Considerably less beer appeared in the store than the invoices indicated in a number of the product categories I had inventoried.

17. After a few weeks of doing this new process, it became apparent that no shortfall was occurring with Coors products but that a number of Orrison products were coming up short. I added a number of Orrison products to the list I was inventorying and identified that the shortfalls were coming in both Budweiser and Miller products and in a variety of packaging sizes, i.e., six packs, twelve packs cases and thirty packs but always in multiple case quantities. I decided that I needed a better surveillance system to record what was happening so I contacted the contractor who had installed the surveillance system at my laundromat and ordered a system for the liquor store. I did notice one week in September that there were no discrepancies with the Orrison delivery on an occasion where Gary Kirchhefer was on vacation and a substitute filled in for him.

18. At that point in time, September and October 2007, I believed that the shortfall was coming in Orrison products and I believed that Gary Kirchhefer was involved but I could not figure exactly how he was doing it. I could not figure how Kirchhefer could accomplish this without the other Orrison employees knowing it and reporting him. I suspected some sort of double billing scheme with beer being delivered to someone else but invoiced to my store. The security system contractor scheduled his installation for the end of October. He was from Denver and I wanted the installation done on a Sunday morning when the store was closed because I didn't want the installation discovered before it had an opportunity to record the actual thefts. I was still concerned that someone inside my store was working with Mr. Kirchhefer. In the meantime I continued to surreptitiously inventory on delivery days.

19. The inventory numbers indicated that the thefts were far larger than a single person or group of people could consume. I suspected that Mr. Kirchhefer was reselling the

beer, either to other customers within his three county district or across state lines into Nebraska or elsewhere. Once the surveillance system was installed Mr. Kirchhefer's method immediately became apparent. I immediately hired a private investigator to attempt to find out where Mr. Kirchhefer was disposing of the stolen beer and who his coconspirators were. From November 2007 through March 2008 private investigators I had hired attempted to trail Mr. Kirchhefer without success. They reported to me that they observed him stealing beer but were unable to tail him to the point of disposal.

20. Also in November 2007 I learned that Mr. Kirchhefer was the son of a deputy sheriff at the Goshen County Sheriff's Office. This made it especially delicate to report his thefts before I had ironclad proof of his crimes. I discussed the investigation with Rick Scott, the investigator from the Goshen County Attorney's office who advised me that bad feelings between the sheriff's office and the city police might cause a problem if the case was investigated by the police. Mr. Scott told me he could not handle the investigation because he worked closely with Mr. Kirchhefer's father. I told him I would prefer to use private investigators from out of town and he agreed that was an acceptable alternative.

21. My private investigators were never able to determine who was purchasing the stolen beer from Mr. Kirchhefer. After Mr. Kirchhefer was fired by Orrison in April of 2008 I turned my investigation information over to the Goshen County Attorney. As feared, Mr. Kirchhefer's father protested the involvement of any Goshen County law enforcement entities investigating the case and the Goshen County Attorney prosecuting it. For that reason DCI agents from the western part of the state had to handle the investigation and a special prosecutor had to be appointed. This resulted in considerable delay to the prosecution of Mr. Kirchhefer. Eventually Mr. Kirchhefer entered into a plea agreement which required him to disclose his co-conspirators. It was only when Mr. Kirchhefer disclosed as part of a sworn statement that he had been selling the stolen beer to Bowen and Halligan that I became aware of their involvement in his beer stealing operation. That deposition occurred on December 18, 2010.

22. I believe that my efforts to investigate the inconsistencies in the beer accounts at J&B Liquor were

diligent and logical. I examined possible accounting system explanations first. I identified a number of possible mechanisms for the discrepancies and investigated each. The fact that the monthly numbers varied depending on the number of weekends or delivery days each month made it difficult to track what was going on. So did the fact that Kirchhefer slowed down his thefts in the winter. Problems that I identified would appear to eliminate the shortfall only to have it pop up again later. I looked for thefts from employees, former employees and associates of former employees before I looked at thefts by my suppliers. I believe this was a logical and appropriate approach. Orrison Distributing is a substantial company with a major presence in the beer business in Wyoming and Colorado. Mr. Kirchhefer was their trusted and well paid employee. I was astounded when I eventually learned he was behind the thefts.

* * * *

24. Mr. Kirchhefer made every effort to hide his thefts. It was not easy to detect him. Even when I had obtained actual video of Mr. Kirchhefer stealing beer from the back door of my store in late October 2007, and provided that video to law enforcement it took two and a half years with further investigation for law enforcement to file charges against Mr. Kirchhefer. Some of that delay was occasioned by the protestations of Mr. Kirchhefer's father, but some was caused because law enforcement felt that full diligence required even further investigation than I had performed. Even after I determined that he was the thief it was very difficult to determine who his co-conspirators were. Despite the efforts of multiple private investigators, Mr. Kirchhefer was able to conceal his network of purchasers used to dispose of the stolen beer.

[¶36] Based upon Mr. Alden's affidavit, it is clear that the parties dispute what steps were necessary to determine the cause of the beer losses and to determine who was involved in those losses. We can only conclude based upon the record before the Court that reasonable minds might differ as to what steps were reasonably necessary to determine both what caused J&B's beer losses and the identity of the wrongdoers (the knowledge of which triggers the conversion statute of limitations). Whether Mr. Alden's

explanations for his delay in discovery are credible and reflect an exercise of reasonable diligence are questions for a jury.[3]

[¶37] The district court did not address or discuss Mr. Alden's affidavit and instead ruled in a conclusory manner that all Plaintiffs had to do was "look" and they would have discovered their causes of action. Where reasonable minds can differ on the conclusions to be drawn from the facts in evidence, and in particular in this case where reasonable minds might differ on what might have been learned upon looking, how much was looking was necessary and reasonable, and how soon the looking reasonably should have been completed, an entry of summary judgment was not warranted. *See Amos v. Lincoln County Sch. Dist. No. 2*, 2015 WY 115, ¶ 19, ___ P.3d ___ (Wyo. 2015) (overturning summary judgment where material facts were generally undisputed but reasonable minds could draw different conclusions from those facts).[4]

## C.    Collateral Estoppel

[¶38] The district court entered summary judgment against Plaintiffs on the additional ground that when the federal district court ruled that Plaintiffs' federal RICO claims were barred by the statute of limitations, it necessarily resolved the factual issue of when Plaintiffs should have discovered, through reasonable diligence, their claims for fraud and conversion. On this basis, the court found that the doctrine of collateral estoppel

---

[3] Our holdings in this opinion apply equally to all Defendants. We find particularly compelling, however, the questions of fact regarding the discovery rule's application to the claims against Defendants Bowen and Halligan and their respective bars. Reasonable minds may certainly differ on whether reasonable diligence required the hiring of a private investigator to follow Defendant Kirchhefer in his delivery of the stolen beer. Indeed, reasonable minds would likely differ on whether Plaintiffs could have even discovered the identities of Bowen and Halligan without Kirchhefer's bargained for statement to law enforcement.

[4] We reject Defendants argument that the district court's summary judgment was warranted on the fraud claim based on this Court's holding in *Rawlinson v. Cheyenne Bd. of Pub. Utils.*, 2001 WY 6, 17 P.3d 13 (Wyo. 2001). In *Rawlinson*, a homeowner sued a public utility for property damage resulting from a leaking fire hydrant, and we upheld a ruling that the homeowner's claim was barred by the statute of limitations. *Rawlinson*, ¶ 18, 17 P.3d at 18. In so holding, we held that pursuant to the discovery rule, the statute of limitations was triggered when the homeowner discovered property damage, not when she discovered the cause of the damage and the tortfeasor. *Id*. We explained that the discovery of the damage triggered the statute of limitations and the limitations period then provided a reasonable period of time for the injured party to discover both her claim and the potential tortfeasor. *Id.*, ¶¶ 16-18, 17 P.3d at 17-18. *Rawlinson* is distinguishable from this case because the claim in *Rawlinson* was for negligence. Pursuant to Wyo. Stat. Ann. § 1-3-106, fraud claims are treated differently. A claim for fraud does not accrue when a party knows or should know of his injury or loss but rather when the party discovers or through the exercise of reasonable diligence could have discovered the fraud. The question the jury must answer in the present case is not when did Plaintiffs know of their loss or injury, but rather when through the exercise of reasonable diligence could Plaintiffs have known of the fraud perpetrated upon them. Defendants' reliance on *Rawlinson* is therefore misplaced.

21

barred Plaintiffs from re-litigating the discovery question. We find the district court erred in its application of collateral estoppel.

[¶39]  This Court has recognized the principle of finality that is served by the doctrine of collateral estoppel:

> The doctrines of res judicata (claim preclusion) and collateral estoppel (issue preclusion) incorporate a universal legal principle of common-law jurisprudence to the effect that "a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies."

*Goodman v. Voss*, 2011 WY 33, ¶ 23, 248 P.3d 1120, 1126 (Wyo. 2011) (quoting *Wyoming Dep't of Revenue v. Exxon Mobil Corp.*, 2007 WY 112, ¶ 17, 162 P.3d 515, 522 (Wyo. 2007)).

[¶40]  We consider four factors in determining whether the doctrine of collateral estoppel applies to bar consideration of an issue:

> 1) whether the issue decided in the prior adjudication was **identical** with the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and (4) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding.

*Carson v. Wyo. Workers' Safety & Comp. Div.*, 2014 WY 42, ¶ 15, 322 P.3d 1261, 1265 (Wyo. 2014) (quoting *Wilkinson v. State ex rel. Wyo. Workers' Safety & Compensation Div. (In re: Wilkinson)*, 991 P.2d 1228, 1234 (Wyo. 1999)) (emphasis in original).

[¶41]  We reject application of collateral estoppel in this case because the issue ruled on by the federal district court was not identical to the issues before the state district court and this Court. As we have indicated herein, the question of when Plaintiffs' claims for conversion and fraud accrued depends on when Plaintiffs could have, through the exercise of reasonable diligence, discovered that their property had been converted and the identity of the wrongdoer (for purposes of the conversion claim), and discovered the fraud. These are not causes of actions that accrue upon discovery of a loss or injury.

[¶42] The federal district court dismissed the Plaintiffs' state conversion and fraud claims without prejudice and, more importantly, did not address the discovery rule as Wyoming law dictates its application to fraud and conversion claims. The discovery rule the federal district court addressed was the rule applicable to federal RICO claims, which looks to when a plaintiff discovers his loss or injury. The federal court described the legal framework governing its analysis:

> The Supreme Court has determined that civil federal RICO claims are subject to a four-year statute of limitations period. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 156 (1987). However, the Supreme Court has yet to definitively determine whether this four year statute begins running: (1) when the plaintiff knew or should have known of his injury (the injury-discovery rule); or (2) when the plaintiff was injured, whether aware of the injury or not (the injury-occurrence rule). *See Dummar*, at 621, citing *Cory v. Aztec Steel Bldg, Inc.*, 468 F.3d 1226, 1234 (10th Cir.2006). Whether under the injury-discovery or harsher injury-occurrence rule, **a plaintiff's awareness of the pattern of racketeering activity is not required to trigger the running of the statute of limitations**. 543 F.3d at 621, citing *Rotella v. Wood*, 528 U.S. 549, 553–54 (2000) ("discovery of the injury, not discovery of the elements of a claim is what starts the clock"). * * *
>
> * * * *
>
> Plaintiffs assert that it was only upon Kirchhefer's arrest and subsequent interview that they learned of Bowen and Halligan's "involvement" and scheme. However, as noted in *Dummar v. Lummis*, 543 F.3d at 621, a plaintiff need not be aware of the pattern of racketeering activity before the statute of limitations begins to run. Moreover, Plaintiffs' argument was expressly, if not implicitly rejected in *Rotella v. Wood*, 528 U.S. 549 (2000) (discovery of injury caused to the business triggers start of statute of limitations not discovery of other elements of claim--such as pattern of RICO activity).

*Kroenlein*, 2013 WL 1337385, *7-8 (emphasis in original).

[¶43] In keeping with this framework, the federal district court's analysis focused on the date of injury or the date on which Plaintiffs could have discovered their injury. *Kroenlein*, 2013 WL 1337385, *7. We recognize that while the federal court's focus was on Plaintiffs' discovery of their losses, the federal court went beyond determining the date on which Plaintiffs should have known of their injury and made a finding that

23

"[t]here is no reason or facts before this Court to show why what was discovered in the fall of 2007 was not discoverable in the fall of 2005." *Id.* We are unwilling, however, to give this finding preclusive effect given that it was made in a context so far afield from our law governing the accrual of fraud claims. *See Carson*, ¶¶ 17-18, 322 P.3d at 1266-68 (rejecting application of collateral estoppel and reasoning that federal jury's finding that employee was injured in the course of employment differs from consideration of that same question in the context of a workers' compensation determination).

[¶44] The federal court did not make its findings through application of state law governing the accrual of fraud and conversion claims or through application of state law defining reasonable diligence. The findings are therefore not entitled to the preclusive effect dictated by collateral estoppel, and the district court erred in applying the doctrine.

## D.  **Continuing Tort Doctrine**

[¶45]  As their final argument, Plaintiffs contend that the continuing tort doctrine applies in this case. In particular, Plaintiffs argue that because the conversion in this matter involves a series of recurring or continuous tortious acts, the cause of action accrues anew with each act and not from the date Plaintiffs first discovered or should have discovered the earliest acts of conversion (and wrongdoer's identity) and fraud. Applying this doctrine, Plaintiffs argue that because the final act of conversion alleged occurred on March 25, 2008, the four-year statute of limitations for the conversion count would not expire until March of 2012.

[¶46]  It is premature for this Court to attempt to address the extent to which the continuing tort doctrine applies in this case because we simply do not yet know how the jury is going to find on the discovery rule application. *See Reed v. Cloninger*, 2006 WY 37, ¶ 22, 131 P.3d 359, 368 (Wyo. 2006) (questions concerning application of the continuing tort doctrine are factual questions that must be resolved by the fact finder). Nonetheless, we foresee that the question of the doctrine's application may arise on remand and we therefore address it to provide clarification on how the doctrine operates under Wyoming law should it come into play on remand. *See Erdelyi*, ¶ 35, 326 P.3d at 175 (citing *Glenn v. Union Pac. R.R. Co.*, 2011 WY 126, ¶ 30, 262 P.3d 177, 191 (Wyo. 2011)) (holding that statute of limitations issue was dispositive of appeal but addressing jury instruction issue that was likely to arise again on remand).

[¶47]  This Court addressed the continuing tort doctrine in *Young v. Young*, 709 P.2d 1254 (Wyo. 1985). In that case, the plaintiff filed an action for conversion against her former husband for recovery of overriding oil and gas royalties she claimed had been wrongfully retained by her former husband. *Id.* at 1255. The royalties were to be paid beginning in 1970, and the plaintiff discovered she had not been receiving them in 1982. *Id*. at 1255-56. She filed her action in 1983, and the district court dismissed the entirety

of her claim as barred by the statute of limitations. *Id*. at 1256. We reversed, in part, explaining:

> As pointed out in *Satterfield v. Sunny Day Resources, Inc.*, *supra*, conversion is a tortious act. Appellee's failure to remit to appellant her royalty share as received was a recurring tort of a sort which involved separate and successive injuries from separate and successive acts. It is an exemplification of periodic recurring wrongful acts—a series of tortious acts, each of which could be the basis for a separate claim, not continuing damage from an original tort.
>
> Various types of tort cases illustrate court holdings in such instances. The rule is that where there are recurring or continuous tortious acts, the applicable statute of limitations accrues from the date of each act that precipitates court action for recovery and not on the date of the first such act. *Cacioppo v. Southwestern Bell Telephone Company*, Mo.App., 550 S.W.2d 919 (1977); *Gowing v. McCandless*, 219 Kan. 140, 547 P.2d 338 (1976); *Shell Oil Company v. Parker*, 265 Md. 631, 291 A.2d 64 (1972); *Nelson v. C & C Plywood Corp.*, 154 Mont. 414, 465 P.2d 314, 39 A.L.R.3d 893 (1970); *Kearney v. Atlantic Cement Company*, 33 App.Div.2d 848, 306 N.Y.S.2d 45 (1969); *Freestate Industrial Development Company v. T. & H., Inc.*, La., 188 So.2d 746 (1966); *Harang v. Aetna Life Insurance Company*, Tex.Civ.App., 400 S.W.2d 810 (1966); *Fergerson v. Utilities Elkhorn Coal Company*, Ky., 313 S.W.2d 395 (1958). In other words, all acts are barred for all the wrongs with injury that accrued prior to the term of limitations running to the date of filing an action for recovery.
>
> It has been wisely observed that a wrongdoer cannot and should not gain a prescriptive right to continue wrongful and injurious acts. *Devoke v. Yazoo & M.V.R. Co.*, 211 La. 729, 30 So.2d 816 (1947); *Nelson v. Robinson*, 47 Cal.App.2d 520, 118 P.2d 350 (1941). While appellant has had the benefit of the statute of limitations for an extended period and its useful purposes preserved, no permanent right is bestowed to continue such wrongful acts during the limitations term immediately preceding the commencement of appellee's action. If allowed during such term, and carrying such a fallacious doctrine to the extreme, appellant would lose even

a future right to her overriding royalties.

> There is a caveat which must go with the doctrine just announced. It must be realized that this Court can only apply a rule applicable to the case at hand. For example, see *Dolph v. Mangus*, Ind.App., 400 N.E.2d 189 (1980), where over a period of years there were recurring wrongful acts and separate injuries, but they had caused and created a cumulative injury to a point of becoming permanent damage before the statutory period next preceding the date of filing of an action for recovery. The court held the claim barred. The rule we adopt fits the facts before us, but its application is relatively narrow and should be applied with caution.

> The ultimate result of applying the rule in the case before us is that appellant may recover for her share of royalties received but not remitted by appellee accruing within the four years next preceding the filing of her district court action. As to the rest, she is barred.

*Young*, 709 P.2d at 1259-60.

[¶48]   As the above discussion and application of the continuing torts doctrine illustrates, the doctrine is not a mechanism to toll the statutes of limitations.  Instead, the doctrine recognizes the discrete nature of each continuing tort and allows a plaintiff to treat each act separately for purposes of the statute of limitations, thereby preventing a defendant from continuing wrongful conduct with impunity when the statute of limitations has run on the earliest discrete acts.  Whether and how the doctrine may operate in this case will depend on the jury's findings concerning when Plaintiffs discovered or should have discovered Defendants' fraud and conversion.

## CONCLUSION

[¶49]   The district court correctly held that the discovery rule applies to the fraud and conversion statutes of limitation.  The district court erred, however, in applying the doctrine of collateral estoppel and in finding that the statutes of limitation for fraud and conversion barred Plaintiffs' actions as a matter of law.  Disputed issues of material fact exist concerning application of the discovery rule to Plaintiffs' claims and those issues of fact precluded summary judgment.  We therefore reverse and remand for proceedings consistent with this opinion.